## NATIONAL LABOR RELATIONS BOARD *v.* RADIO AND TELEVISION BROADCAST ENGINEERS UNION, LOCAL 1212, INTERNATIONAL BROTHERHOOD OF ELECTRICAL WORKERS, AFL–CIO.

No. 69.   Argued November 10, 14, 1960.—Decided January 9, 1961.

*Dominick L. Manoli* argued the cause for petitioner. With him on the brief were *Solicitor General Rankin, Stuart Rothman, Norton J. Come* and *Melvin J. Welles.*

*Robert Silagi* and *Louis Sherman* argued the cause for respondent.   With them on the brief were *Joseph B. Robison* and *Joseph M. Stone.*

574

MR. JUSTICE BLACK delivered the opinion of the Court.

This case, in which the Court of Appeals refused to enforce a cease-and-desist order of the National Labor Relations Board, grew out of a "jurisdictional dispute" over work assignments between the respondent union, composed of television "technicians,"[1] and another union, composed of "stage employees."[2] Both of these unions had collective bargaining agreements in force with the Columbia Broadcasting System and the respondent union was the certified bargaining agent for its members, but neither the certification nor the agreements clearly apportioned between the employees represented by the two unions the work of providing electric lighting for television shows. This led to constant disputes, extending over a number of years, as to the proper assignment of this work, disputes that were particularly acrimonious with reference to "remote lighting," that is, lighting for telecasts away from the home studio. Each union repeatedly urged Columbia to amend its bargaining agreement so as specifically to allocate remote lighting to its members rather than to members of the other union. But, as the Board found, Columbia refused to make such an agreement with either union because "the rival locals had failed to agree on the resolution of this jurisdictional dispute over remote lighting."[3] Thus feeling

---

[1] Radio & Television Broadcast Engineers Union, Local 1212, International Brotherhood of Electrical Workers, AFL–CIO.

[2] Theatrical Protective Union No. 1, International Alliance of Theatrical Stage Employees and Moving Picture Machine Operators of the United States and Canada, AFL–CIO.

[3] The other major television broadcasting companies have also been forced to contend with this same problem. The record shows that there has been joint bargaining on this point between Columbia, National and American Broadcasting Systems on the one hand and the unions on the other. All the companies refused to allocate the work to either union because the unions did not agree among them-

itself caught "between the devil and the deep blue,"[4] Columbia chose to divide the disputed work between the two unions according to criteria improvised apparently for the sole purpose of maintaining peace between the two. But, in trying to satisfy both of the unions, Columbia has apparently not succeeded in satisfying either. During recent years, it has been forced to contend with work stoppages by each of the two unions when a particular assignment was made in favor of the other.[5]

The precise occasion for the present controversy was the decision of Columbia to assign the lighting work for a major telecast from the Waldorf-Astoria Hotel in New York City to the stage employees. When the technicians' protest of this assignment proved unavailing, they refused to operate the cameras for the program and thus forced its cancellation.[6]   This caused Columbia to file the unfair labor practice charge which started these proceedings, claiming a violation of § 8 (b)(4)(D) of the National Labor Relations Act.[7]   That section clearly makes it an unfair labor practice for a labor union to induce a strike or

selves.   Columbia's vice president in charge of labor relations explained the situation in these terms: "All three companies negotiating jointly here took the position that they could not do this. They could not give exclusive jurisdiction because each of them had a conflicting claim from another union." See also *National Association of Broadcast Engineers,* 105 N. L. R. B. 355.

[4] This phrase was used by the Hearing Examiner to describe the position of Columbia as explained by its vice president in charge of labor relations.

[5] See *Theatrical Protective Union No. 1, International Alliance of Theatrical Stage Employees,* 124 N. L. R. B. 249, for a report of a recent jurisdictional strike against Columbia by the same stage employees' union involved here which resulted from an assignment of remote lighting work favorable to the technicians.

[6] Respondent, for the purposes of this proceeding only, concedes the correctness of a Board finding to this effect.

[7] 29 U. S. C. § 158 (b)(4)(D).

a concerted refusal to work in order to compel an employer to assign particular work to employees represented by it rather than to employees represented by another union, unless the employer's assignment is in violation of "an order or certification of the Board determining the bargaining representative for employees performing such work . . . ." [8] Obviously, if § 8 (b) (4) (D) stood alone, what this union did in the absence of a Board order or certification entitling its members to be assigned to these particular jobs would be enough to support a finding of an unfair labor practice in a normal proceeding under § 10 (c) of the Act.[9] But when Congress created this new type of unfair labor practice by enacting § 8 (b) (4) (D) as part of the Taft-Hartley Act in 1947, it also added § 10 (k) to the Act.[10] Section 10 (k), set out below,[11] quite plainly emphasizes the belief of Congress

---

[8] Section 8 (b). "It shall be an unfair labor practice for a labor organization or its agents—

.          .          .          .

"(4) . . . to induce or encourage the employees of any employer to engage in, a strike or a concerted refusal . . . to perform any services, where an object thereof is: . . . (D) forcing or requiring any employer to assign particular work to employees in a particular labor organization or in a particular trade, craft, or class rather than to employees in another labor organization or in another trade, craft, or class, unless such employer is failing to conform to an order or certification of the Board determining the bargaining representative for employees performing such work: . . ."

[9] 29 U. S. C. § 160 (c).

[10] 29 U. S. C. § 160 (k).

[11] "Whenever it is charged that any person has engaged in an unfair labor practice within the meaning of paragraph (4) (D) of section 8 (b), the Board is empowered and directed to hear and determine the dispute out of which such unfair labor practice shall have arisen, unless . . . the parties to such dispute submit to the Board satisfactory evidence that they have adjusted, or agreed upon methods for the voluntary adjustment of, the dispute. Upon compliance by the parties to the dispute with the decision of the Board or upon such voluntary adjustment of the dispute, such charge shall be dismissed."

that it is more important to industrial peace that jurisdictional disputes be settled permanently than it is that unfair labor practice sanctions for jurisdictional strikes be imposed upon unions.   Accordingly, § 10 (k) offers strong inducements to quarrelling unions to settle their differences by directing dismissal of unfair labor practice charges upon voluntary adjustment of jurisdictional disputes.   And even where no voluntary adjustment is made, "the Board is empowered and directed," by § 10 (k), "to hear and determine the dispute out of which such unfair labor practice shall have arisen," and upon compliance by the disputants with the Board's decision the unfair labor practice charges must be dismissed.

In this case respondent failed to reach a voluntary agreement with the stage employees union so the Board held the § 10 (k) hearing as required to "determine the dispute."   The result of this hearing was a decision that the respondent union was not entitled to have the work assigned to its members because it had no right to it under either an outstanding Board order or certification, as provided in § 8 (b)(4)(D), or a collective bargaining agreement.[12]   The Board refused to consider other criteria, such as the employer's prior practices and the custom of the industry, and also refused to make an affirmative award of the work between the employees

---

[12] This latter consideration was made necessary because the Board has adopted the position that jurisdictional strikes in support of contract rights do not constitute violations of § 8 (b)(4)(D) despite the fact that the language of that section contains no provision for special treatment of such strikes.   See *Local 26, International Fur Workers,* 90 N. L. R. B. 1379.   The Board has explained this position as resting upon the principle that "to fail to hold as controlling . . . the contractual preemption of the work in dispute would be to encourage disregard for observance of binding obligations under collective-bargaining agreements and invite the very jurisdictional disputes Section 8 (b)(4)(D) is intended to prevent." *National Association of Broadcast Engineers, supra,* n. 3, at 364.

represented by the two competing unions. The respond-
ent union refused to comply with this decision, contending
that the Board's conception of its duty to "determine the
dispute" was too narrow in that this duty is not at all
limited, as the Board would have it, to strictly legal
considerations growing out of prior Board orders, certifi-
cations or collective bargaining agreements. It urged,
instead, that the Board's duty was to make a final deter-
mination, binding on both unions, as to which of the
two unions' members were entitled to do the remote
lighting work, basing its determination on factors deemed
important in arbitration proceedings, such as the nature
of the work, the practices and customs of this and other
companies and of these and other unions, and upon other
factors deemed relevant by the Board in the light of
its experience in the field of labor relations. On the
basis of its decision in the § 10 (k) proceeding and
the union's challenge to the validity of that decision, the
Board issued an order under § 10 (c) directing the union
to cease and desist from striking to compel Columbia to
assign remote lighting work to its members. The Court
of Appeals for the Second Circuit refused to enforce the
cease-and-desist order, accepting the respondent's conten-
tion that the Board had failed to make the kind of
determination that § 10 (k) requires.[13]  The Third [14] and
Seventh [15] Circuits have construed § 10 (k) the same way,
while the Fifth Circuit [16] has agreed with the Board's
narrower conception of its duties. Because of this con-
flict and the importance of this problem, we granted
certiorari.[17]

---

[13] 272 F. 2d 713.

[14] *N. L. R. B.* v. *United Association of Journeymen,* 242 F. 2d 722.

[15] *N. L. R. B.* v. *United Brotherhood of Carpenters,* 261 F. 2d 166.

[16] *N. L. R. B.* v. *Local 450, International Union of Operating Engi-
neers,* 275 F. 2d 413.

[17] 363 U. S. 802.

We agree with the Second, Third and Seventh Circuits that § 10 (k) requires the Board to decide jurisdictional disputes on their merits and conclude that in this case that requirement means that the Board should affirmatively have decided whether the technicians or the stage employees were entitled to the disputed work. The language of § 10 (k), supplementing § 8 (b)(4)(D) as it does, sets up a method adopted by Congress to try to get jurisdictional disputes settled. The words "hear and determine the dispute" convey not only the idea of hearing but also the idea of deciding a controversy. And the clause "the dispute out of which such unfair labor practice shall have arisen" can have no other meaning except a jurisdictional dispute under § 8 (b)(4)(D) which is a dispute between two or more groups of employees over which is entitled to do certain work for an employer. To determine or settle the dispute as between them would normally require a decision that one or the other is entitled to do the work in dispute. Any decision short of that would obviously not be conducive to quieting a quarrel between two groups which, here as in most instances, is of so little interest to the employer that he seems perfectly willing to assign work to either if the other will just let him alone. This language also indicates a congressional purpose to have the Board do something more than merely look at prior Board orders and certifications or a collective bargaining contract to determine whether one or the other union has a clearly defined statutory or contractual right to have the employees it represents perform certain work tasks. For, in the vast majority of cases, such a narrow determination would leave the broader problem of work assignments in the hands of the employer, exactly where it was before the enactment of § 10 (k)—with the same old basic jurisdictional dispute likely continuing to vex him, and the rival unions, short of striking, would still be free to adopt other forms of pressure upon the employer. The

§ 10 (k) hearing would therefore accomplish little but a restoration of the pre-existing situation, a situation already found intolerable by Congress and by all parties concerned. If this newly granted Board power to hear and determine jurisdictional disputes had meant no more than that, Congress certainly would have achieved very little to solve the knotty problem of wasteful work stoppages due to such disputes.

This conclusion reached on the basis of the language of § 10 (k) and § 8 (b)(4)(D) is reinforced by reference to the history of those provisions. Prior to the enactment of the Taft-Hartley Act, labor, business and the public in general had for a long time joined in hopeful efforts to escape the disruptive consequences of jurisdictional disputes and resulting work stoppages. To this end unions had established union tribunals, employers had established employer tribunals, and both had set up joint tribunals to arbitrate such disputes.[18] Each of these efforts had helped some but none had achieved complete success. The result was a continuing and widely expressed dissatisfaction with jurisdictional strikes. As one of the forerunners to these very provisions of the Act, President Truman told the Congress in 1947 that disputes "involving the question of which labor union is entitled to perform a particular task" should be settled, and that if the "rival unions are unable to settle such disputes themselves, provision must be made for peaceful and binding determination of the issues."[19] And the House Committee report on one of the proposals out of which these sections came recognized the necessity of enacting legisla-

---

[18] For a review and criticism of some of these efforts, see Dunlop, Jurisdictional Disputes, N. Y. U. 2d Ann. Conference on Labor 477, at 494–504.

[19] 93 Cong. Rec. 136.

tion to protect employers from being "the helpless victims of quarrels that do not concern them at all." [20]

The Taft-Hartley Act as originally offered contained only a section making jurisdictional strikes an unfair labor practice. Section 10 (k) came into the measure as the result of an amendment offered by Senator Morse which, in its original form, proposed to supplement this blanket proscription by empowering and directing the Board either "to hear and determine the dispute out of which such unfair labor practice shall have arisen or to appoint an arbitrator to hear and determine such dispute . . . ." [21] That the purpose of this amendment was to set up machinery by which the underlying jurisdictional dispute would be settled is clear and, indeed, even the Board concedes this much. The authority to appoint an arbitrator passed the Senate [22] but was eliminated in conference,[23] leaving it to the Board alone "to hear and determine" the underlying jurisdictional dispute. The Board's position is that this change can be interpreted as an indication that Congress decided against providing for the compulsory determination of jurisdictional disputes. We find this argument unpersuasive, to say the very least. The obvious effect of this change was simply to place the responsibility for compulsory determination of the dis-

---

[20] H. R. Rep. No. 245, 80th Cong., 1st Sess., p. 23, I Legislative History of the Labor Management Relations Act, 1947, at 314 (hereinafter cited as Leg. Hist.).

[21] The amendment was contained in a bill (S. 858) offered by Senator Morse, which also contained a number of other proposals. 93 Cong. Rec. 1913, II Leg. Hist. 987.

[22] I Leg. Hist. 241, 258–259. See also the Senate Committee Report on the bill, S. Rep. No. 105, 80th Cong., 1st Sess., p. 8, I Leg. Hist. 414.

[23] H. R. Conf. Rep. No. 510, 80th Cong., 1st Sess., p. 57, I Leg. Hist. 561.

pute entirely on the Board, not to eliminate the requirement that there be such a compulsory determination. The Board's view of its powers thus has no more support in the history of § 10 (k) than it has in the language of that section. Both show that the section was designed to provide precisely what the Board has disclaimed the power to provide—an effective compulsory method of getting rid of what were deemed to be the bad consequences of jurisdictional disputes.

The Board contends, however, that this interpretation of § 10 (k) should be rejected, despite the language and history of that section. In support of this contention, it first points out that § 10 (k) sets forth no standards to guide it in determining jurisdictional disputes on their merits. From this fact, the Board argues that § 8 (b)(4)(D) makes the employer's assignment decisive unless he is at the time acting in violation of a Board order or certification and that the proper interpretation of § 10 (k) must take account of this right of the employer. It is true, of course, that employers normally select and assign their own individual employees according to their best judgment. But here, as in most situations where jurisdictional strikes occur, the employer has contracted with two unions, both of which represent employees capable of doing the particular tasks involved. The result is that the employer has been placed in a situation where he finds it impossible to secure the benefits of stability from either of these contracts, not because he refuses to satisfy the unions, but because the situation is such that he cannot satisfy them. Thus, it is the employer here, probably more than anyone else, who has been and will be damaged by a failure of the Board to make the binding decision that the employer has not been able to make. We therefore are not impressed by the Board's solicitude for the employer's right to do that which he has not been, and most likely will not be,

able to do. It is true that this forces the Board to exercise under § 10 (k) powers which are broad and lacking in rigid standards to govern their application. But administrative agencies are frequently given rather loosely defined powers to cope with problems as difficult as those posed by jurisdictional disputes and strikes. It might have been better, as some persuasively argued in Congress, to intrust this matter to arbitrators. But Congress, after discussion and consideration, decided to intrust this decision to the Board. It has had long experience in hearing and disposing of similar labor problems. With this experience and a knowledge of the standards generally used by arbitrators, unions, employers, joint boards and others in wrestling with this problem, we are confident that the Board need not disclaim the power given it for lack of standards. Experience and common sense will supply the grounds for the performance of this job which Congress has assigned the Board.

The Board also contends that respondent's interpretation of § 10 (k) should be avoided because that interpretation completely vitiates the purpose of Congress to encourage the private settlement of jurisdictional disputes. This contention proceeds on the assumption that the parties to a dispute will have no incentive to reach a private settlement if they are permitted to adhere to their respective views until the matter is brought before the Board and then given the same opportunity to prevail which they would have had in a private settlement. Respondent disagrees with this contention and attacks the Board's assumption. We find it unnecessary to resolve this controversy for it turns upon the sort of policy determination that must be regarded as implicitly settled by Congress when it chose to enact § 10 (k). Even if Congress has chosen the wrong way to accomplish its aim, that choice is binding both upon the Board and upon this Court.

The Board's next contention is that respondent's interpretation of § 10 (k) should be rejected because it is inconsistent with other provisions of the Taft-Hartley Act. The first such inconsistency urged is with §§ 8 (a)(3) and 8 (b)(2) [24] of the Act on the ground that the determination of jurisdictional disputes on their merits by the Board might somehow enable unions to compel employers to discriminate in regard to employment in order to encourage union membership. The argument here, which is based upon the fact that § 10 (k), like § 8 (b)(4)(D), extends to jurisdictional disputes between unions and unorganized groups as well as to disputes between two or more unions, appears to be that groups represented by unions would almost always prevail over nonunion groups in such a determination because their claim to the work would probably have more basis in custom and tradition than that of unorganized groups. No such danger is present here, however, for both groups of employees are represented by unions. Moreover, we feel entirely confident that the Board, with its many years of experience in guarding against and redressing violations of §§ 8 (a)(3) and 8 (b)(2), will devise means of discharging its duties under § 10 (k) in a manner entirely harmonious with those sections. A second inconsistency is urged with § 303 (a)(4) of the Taft-Hartley Act,[25] which authorizes suits for damages suffered because of jurisdictional strikes. The argument here is that since § 303.(a)(4) does not permit a union to establish, as a defense to an action for damages under that section, that it is entitled to the work struck for on the basis of such factors as practice or custom, a similar result is required here in order to preserve "the substantive symmetry" between § 303 (a)(4) on the one hand and §§ 8 (b)(4)(D) and

---

[24] 29 U. S. C. §§ 158 (a)(3) and 158 (b)(2).

[25] 29 U. S. C. § 187 (a)(4).

10 (k) on the other.　This argument ignores the fact that this Court has recognized the separate and distinct nature of these two approaches to the problem of handling jurisdictional strikes.[26]　Since we do not require a "substantive symmetry" between the two, we need not and do not decide what effect a decision of the Board under § 10 (k) might have on actions under § 303 (a)(4).

The Board's final contention is that since its construction of § 10 (k) was adopted shortly after the section was added to the Act and has been consistently adhered to since, that construction has itself become a part of the statute by reason of congressional acquiescence.　In support of this contention, the Board points out that Congress has long been aware of its construction and yet has not seen fit to adopt proposed amendments which would have changed it.　In the ordinary case, this argument might have some weight.　But an administrative construction adhered to in the face of consistent rejection by Courts of Appeals is not such an ordinary case.　Moreover, the Board had a regulation on this subject from 1947 to 1958 which the Court of Appeals for the Seventh Circuit thought, with some reason, was wholly inconsistent with the Board's present interpretation.[27]　With all this uncertainty surrounding the eventual authoritative interpretation of the existing law, the failure of Congress to enact a new law simply will not support the inference which the Board asks us to make.

[26] *International Longshoremen's Union* v. *Juneau Spruce Corp.,* 342 U. S. 237.

[27] See *N. L. R. B.* v. *United Brotherhood of Carpenters, supra,* at 170–172.　The Rules and Regulations adopted in 1947 by the Board provided that in § 10 (k) proceedings the Board was "to certify the labor organization or the particular trade, craft, or class of employees, as the case may be, *which shall perform the particular work tasks in issue,* or to make other disposition of the matter." (Emphasis supplied.)　29 CFR, 1957 Supp., § 102.73.　This rule remained in effect until 1958.

We conclude therefore that the Board's interpretation of its duty under § 10 (k) is wrong and that under that section it is the Board's responsibility and duty to decide which of two or more employee groups claiming the right to perform certain work tasks is right and then specifically to award such tasks in accordance with its decision. Having failed to meet that responsibility in this case, the Board could not properly proceed under § 10 (c) to adjudicate the unfair labor practice charge. The Court of Appeals was therefore correct in refusing to enforce the order which resulted from that proceeding.

*Affirmed.*