NATIONAL LABOR RELATIONS BOARD, Petitioner,

v.

LOCAL UNION NO. 3, INTERNATIONAL BROTHERHOOD OF ELECTRICAL WORKERS, AFL–CIO, Respondent.

No. 33, Docket 28829.

United States Court of Appeals Second Circuit.

Argued Oct. 26, 1964.

Decided Dec. 4, 1964.

Melvin J. Welles, Attorney, N. L. R. B., Washington, D. C. (Arnold Ordman, General Counsel, Dominick L. Manoli,

Associate General Counsel, Marcel Mallett-Prevost, Asst. General Counsel, Lee M. Modjeska, Paula Omansky, Attorneys, N. L. R. B.), for petitioner.

Harold Stern, New York City (Norman Rothfeld, New York City, of counsel), for respondent.

Before LUMBARD, Chief Judge, and HAYS and MARSHALL, Circuit Judges.

HAYS, Circuit Judge:

In this case, involving a claim by Local 3 of the International Brotherhood of Electrical Workers to do certain work assigned by the New York Telephone Company to Western Electric employees who are represented by the Communications Workers of America, determination of whether or not to enforce the order of the National Labor Relations Board [1] depends upon the resolution of the following issues: (1) whether there is sufficient evidence on the record as a whole to support the finding that Local 3 has violated Section 8(b) (4) (i) and (ii) (D) of the National Labor Relations Act [2] and (2) whether the Board has acted within its power under Section 10(k) [3]

1. 144 N.L.R.B. 1318 (1963). The § 10(k) determination is reported at 141 N.L.R.B. 888 (1963).

2. 61 Stat. 140 (1947), as amended, 73 Stat. 542 (1959), 29 U.S.C. § 158(b) (4) (i) and (ii) (D) (1958 & Supp. V, 1964):
"It shall be an unfair practice for a labor organization or its agents—
 * * * * *
"(4) (i) to engage in, or to induce or encourage any individual employed by any person engaged in commerce or in an industry affecting commerce to engage in, a strike or a refusal in the course of his employment to use, manufacture, process, transport, or otherwise handle or work on any goods, articles, materials, or commodities or to perform any services; or (ii) to threaten, coerce, or restrain any person engaged in commerce or in an industry affecting commerce, where in either case an object thereof is—
 * * * * *
"(D) forcing or requiring any employer to assign particular work to employees

in a particular labor organization or in a particular trade, craft, or class rather than to employees in another labor organization or in another trade, craft, or class, unless such employer is failing to conform to an order or certification of the Board determining the bargaining representative for employees performing such work * * *"

3. 61 Stat. 146 (1947), 29 U.S.C. § 160(k) (1958):
"(k) Whenever it is charged that any person has engaged in an unfair labor practice within the meaning of paragraph (4) (D) of section 158(b) of this title, the Board is empowered and directed to hear and determine the dispute out of which such unfair labor practice shall have arisen, unless, within ten days after notice that such charge has been filed, the parties to such dispute submit to the Board satisfactory evidence that they have adjusted, or agreed upon methods for the voluntary adjustment of, the dispute. Upon compliance by the parties to the dispute with the decision of the

in awarding the disputed work to the employees represented by the Communications Workers of America rather than to Local 3.

 There is no need to detail the evidence relied on by the Board for its finding that Local 3 committed the unfair labor practice defined in Section 8(b) (4) (i) and (ii) (D). That evidence amply demonstrates that Local 3 by seeking to persuade employees to refuse to work, by threats of work stoppage, by threats to cut off light and power, and by carrying out these threats, induced and encouraged employees to engage in work stoppages and threatened persons engaged in commerce within the meaning of the Act.

Under NLRB v. Radio and Television Broadcast Eng'rs Union, 364 U.S. 573, 81 S.Ct. 330, 5 L.Ed.2d 302 (1961), known as the CBS case, the unfair labor practice charge against Local 3 must be dismissed unless the Board in a prior proceeding under Section 10(k) has determined that the disputed work should not be assigned to that union. This is the first case to come to us in which the Board has applied the procedure required by the Supreme Court in the CBS case.[4] It is therefore our duty to examine with special care the standards which the Board has adopted and its application of those standards to the case at hand.

In the CBS case the Supreme Court said:

> "It is true that this forces the Board to exercise under § 10(k) powers which are broad and lacking in rigid standards to govern their application. But administrative agencies are frequently given rather loosely defined powers to cope with problems as difficult as those posed by jurisdictional disputes and strikes. It might have been better, as some persuasively argued in Congress, to intrust this matter to arbitrators. But Congress, after discussion and consideration, decided to intrust this decision to the Board. It has had long experience in hearing and disposing of similar labor problems. With this experience and a knowledge of the standards generally used by arbitrators, unions, employers, joint boards and others in wrestling with this problem, we are confident that the Board need not disclaim the power given it for lack of standards. Experience and common sense will supply the grounds for the performance of this job which Congress has assigned the Board." [5]

The Court's recital in the CBS case of the respondent's contentions appears also to be not without significance. In this connection the Court mentions the following standards: "the employer's prior practices and the custom of the industry," [6] "factors deemed important in arbitration proceedings, such as the nature of the work, the practices and customs of this and other companies and of these and other unions." [7]

The Board has announced that "at this beginning stage" it "will not formulate general rules." The Board will consider, it says, "all relevant factors" including, for example, "the skills and work involved, certifications by the Board, company and industry practice, agreements between unions * * *, awards of arbitrators, joint boards, and the AFL-CIO in the same or related cases, the assignment made by the employer,

---

Board or upon such voluntary adjustment of the dispute, such charge shall be dismissed."

4. The Board's Section 10(k) findings have been approved in NLRB v. Des Moines Electrotypers' Union, 291 F.2d 381 (8th Cir. 1961); NLRB v. Local 825, Int'l Union of Operating Eng'rs, 326 F.2d 213

(3d Cir. 1964); and NLRB v. Local 991, Int'l Longshoremen's Ass'n, 332 F.2d 66 (5th Cir. 1964).

5. 364 U.S. at 583, 81 S.Ct. at 336.

6. 364 U.S. at 577, 81 S.Ct. at 333.

7. 364 U.S. at 578, 81 S.Ct. at 334.

and the efficient operation of the employer's business." [8]

In the present case the Board's Section 10(k) determination [9] is based upon the following considerations: the type of equipment to be installed; the past practice of the parties with respect to installations of this kind; the skills required for the work; the experience of the respective employees in this type of work; economic and cost factors.

The Board found that the employees now represented by the C. W. A. have had a long history of making installations of the type involved in the present case and that Local 3 employees have engaged in such installations only in exceptional circumstances. In other words in assigning the work to Western Electric employees rather than to Local 3 employees the Telephone Company was, as the Board put it, following "its time-honored practice."

The work, according to the Board, was largely preliminary to installation of electrical equipment. It did not require the special skill of the electricians who are members of Local 3, and could be better performed by Western Electric's employees who had, by reason of special training and of long practice, acquired skill in assembling and erecting the preparatory materials.

Finally the Board found that the use of Western Electric employees was more economical than would be the use of Local 3 members.

We cannot say that the standards adopted by the Board for its 10(k) determination are not proper standards. They appear to be relevant to the important aspects of the issue posed for the Board's decision. The applicability of the standards to the facts of the present case is fully supported by the evidence in the record.

We grant enforcement of the Board's order.

---

8. International Ass'n of Machinists (J. A. Jones Constr. Co.), 135 N.L.R.B. 1402, 1410–1411 (1962).

9. 141 N.L.R.B. 888 (1963).