**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**INTERNATIONAL LONGSHOREMEN'S AND WAREHOUSEMEN'S UNION; and Local 4, International Longshoremen's and Warehousemen's Union, Respondents.**

**No. 22747.**

United States Court of Appeals
Ninth Circuit.
May 28, 1969.

---

Allison W. Brown, Jr. (argued), Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Assoc. Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, Ian D. Lanoff, Washington, D. C., Robert J. Wiener, Seattle, Wash., for petitioner.

Norman Leonard (argued), of Gladstein, Anderson, Leonard & Sibbett, San Francisco, Cal., for respondents.

Before HAMLEY, HAMLIN and HUFSTEDLER, Circuit Judges.

HAMLEY, Circuit Judge:

This matter is before us on the petition of the National Labor Relations Board (Board) for enforcement of its decision and order (163 NLRB 142) requiring respondent unions to cease and desist asserted unfair labor practices pertaining to the operation of Aluminum Company of America (company) at Vancouver, Washington.

The following facts, substantially as stated in the opening brief, are not disputed. The company is engaged in the manufacture of aluminum products at plants throughout the United States. The company's Vancouver Works is a large smelter and aluminum casting and fabricating plant located on a tract of land adjacent to the north bank of the Columbia River, four miles downstream from Vancouver and Portland, Oregon. The basic ingredient of aluminum is alumina, a fine, powdery, difficult-to-handle material obtained by refining bauxite ore.

From 1940 to 1965, alumina had been shipped to the Vancouver Works exclusively by railroad boxcars from the company-owned refining plants in Louisiana and Texas. For the last eighteen of those twenty-five years, the unloading of the boxcars at the Vancouver Works has been performed by company employees represented by the Aluminum Trades Council of Vancouver, affiliated with the Aluminum Workers International Union and Local 300 (Aluminum Workers).

In October, 1965, the company began receiving most of its alumina by vessel directly from its new refining facilities at Surinam, South America, while continuing to receive alumina in reduced quantities by railroad boxcar from other sources. To unload the vessels, the existing conveyor system was extended from the boxcar unloading shed to a hopper located on piling in the Columbia River. Mooring buoys were also constructed to secure the vessel during unloading of the ship. These facilities were used exclusively by the company.

Alumina is pulled from boxcars by air equipment. However, the ship is unloaded by the use of a clam-shell bucket operated by a crane which scoops the ore out of the hold of the vessel and deposits it into the hopper. Ordinarily a bulldozer must be used to move some alumina from the corners of the hold to within

reach of the crane.[1] The alumina flows from the hopper onto the extended conveyor belt. It then moves through the boxcar unloading shed and blends with alumina being unloaded from boxcars. It is next deposited in storage tanks. From the storage tanks, the alumina is discharged into buckets which are transported by overhead cranes to hoppers from which it is fed into electrolytic cells, called "pots," for processing.

At the time this controversy arose only one ship, the S. S. LYSLAND, was used for alumina delivery. This ship is leased by the company and, on the run from Surinam to the Vancouver Works, carries only company-owned bulk alumina.[2] However, the S. S. LYSLAND is capable of carrying other cargo.

The round trip between Surinam and Vancouver takes approximately forty-five days. Upon arrival at Vancouver, the ship is unloaded by a crew comprising an ore craneman-transferman, two ore transfermen, and a laborer. Altogether sixteen company employees do the unloading work, as four shifts are necessary to ensure seven-day-a-week, around-the-clock unloading. These employees also unload railroad boxcars and are regularly employed in the production and maintenance unit represented by the Aluminum Workers union.

In the course of in-plant operations at the Vancouver Works, alumina is commonly moved from place to place by employees using cranes and conveyors. In the performance of such plant tasks, substantially the same skills are required as those involved in unloading the LYSLAND in the manner described. When the LYSLAND is not in port or cannot be unloaded because of difficulties with the unloading equipment, company employees who would otherwise engage in unloading can work elsewhere in the plant. Were the unloading turned over to longshoremen, company officials contemplate a reduction in the number of employees represented by Aluminum Workers.

After officials of respondent unions were unsuccessful in their efforts to have the unloading assigned to longshoremen, they warned the company that their unions would use whatever methods were at their disposal to obtain the work, including "trouble in other areas." Longshoremen later refused to load an outbound cargo of cryolite, boxed in plywood containers, which the company desired to ship on the LYSLAND from the Port of Vancouver to Surinam. At that time an official of respondent unions told the company that the ship was "blacklisted."

This led the company to file an unfair labor practice charge with the Board. Specifically, the company charged that respondent unions were threatening, coercing or restraining the company with an object of forcing or requiring it to assign the ship unloading work to longshoremen rather than to company employees represented by the Aluminum Workers union, in violation of section 8 (b) (4) (D) of the National Labor Relations Act, as amended (Act), 73 Stat. 525, 29 U.S.C. § 158(b) (4) (D) (1964).

In accordance with established procedures, the Board held this charge in abeyance while it conducted a hearing pursuant to section 10(k) of the Act, 61 Stat. 146, 29 U.S.C. § 160(k), to determine the underlying work dispute. After this hearing, the Board issued its decision and determination (158 NLRB 1024) holding that the employees of the company represented by the Aluminum Workers union were entitled to continue to perform the work of unloading alumina from the LYSLAND when it docked at the Vancouver Works. It also found that the respondent unions were not entitled to force the company to assign the

---

1. These unloading facilities were to be superseded in 1967 by a dock with a shore-based gantry-type crane which would scoop alumina from the holds of the vessel and run on rails from the ship to the starting point of the conveyor.

2. It was contemplated that more than one ship would be leased by the company and, in fact, one other ship, the S.S. RAOLD JARL, has been used.

disputed work to longshoremen. The Board directed respondent unions to notify the Board's regional director within ten days whether they would comply with the Board's determination.

Since such a notification was not received, the Board's general counsel issued a complaint against respondent unions alleging a violation of section 8(b) (4) (D) of the Act. At the hearing in that proceeding the parties stipulated that the record and exhibits of the section 10(k) proceeding were to be received into the record of the unfair labor practice proceeding. In agreement with the trial examiner, the Board found and concluded that respondent unions had violated section 8(b) (4) (D) as charged. It ordered them to cease and desist from engaging in such violations and to post appropriate notices.

It is not disputed that, if, under these facts, company employees were entitled to the work assignment in question, the conduct of respondent unions constituted threatening, coercive and restraining action of the kind proscribed by section 8(b) (4) (D) of the Act.

We must accept the Board's determination that employees represented by the Aluminum Workers union were, under the undisputed facts, entitled to this work assignment unless such determination is arbitrary and capricious. Our function is limited in this manner because, as in the case of all jurisdictional disputes, the Board was called upon to apply its experience and special expertise in considering all relevant factors, unfettered by rigid standards. N. L. R. B. v. Radio and Television Broadcast Engineers Union, Local 1212 (C.B.S. case), 364 U.S. 573, 583, 81 S.Ct. 330, 5 L.Ed.2d 302.

The unloading of ocean-going vessels is usually regarded as longshoremen's work, and in that work it is customary for longshoremen to use cranes and bulldozers. Moreover, the constitution of the International Longshoremen's and Warehousemen's Union asserts jurisdiction over employees engaged in the un-

loading of vessels and operations incidental thereto.

The basic certification of that union has been held to involve "in its broadest sense * * * the loading and unloading of waterborne cargo." American Mail Line, 144 NLRB 1432, 1442. It has specifically been held to include the operation of cranes. Howard Terminal Co., 147 NLRB 359; Albin Stevedore Co., 144 NLRB 1443. The basic contract of respondent unions with the Pacific Maritime Association (PMA) gives the longshoremen jurisdiction over "all movement of cargo on vessels of any type or on docks or to or from railroad cars or barges at docks. * * * " The contract of the Aluminum Workers union relates only to "the operation of the plant."

On the other hand, the Board found that respondent unions have never had a contract with the company, nor are they the certified representative of any of the company's employees. The Aluminum Workers union is the certified representative of the company's production and maintenance employees and has had a continuing contract relationship with the company since 1947. The certification and contract of the Aluminum Workers union does not, and could not, specifically cover the work of unloading ships because those jobs came into existence after the certification was issued. But the Board found that the job descriptions with respect to the disputed work are substantially identical with those of regular jobs included in the regular production and maintenance unit. The Board further found that the present contract has been interpreted by the company and the Aluminum Workers union to cover the work in dispute.

The Board found that the employees represented by the Aluminum Workers union have been doing the unloading work to the company's satisfaction since the operation began. The ship unloading was a natural extension of the boxcar unloading of alumina at adjacent facilities. The Board found that the award of the work to longshoremen would result in a loss of jobs by employees represent-

ed by the Aluminum Workers union, whereas an award to the latter would not entail a job loss to longshoremen since they have never performed this work. The Board also found that employment of longshoremen for the unloading work would almost certainly decrease the efficiency and economy of the operation.

While the unloading of ocean-going ships is generally considered to be longshore work, the Board in effect decided that this tradition is not applicable here. The reason for this is that the unloading in question involves neither commercial cargo in the ordinary sense, nor cargo carried in ships which are also carrying commercial cargo on the same voyage, nor ships over which the company has no control, nor unloading operations at a commercial dock.

On the contrary, the unloading involves only company-owned cargo, consisting of raw materials for its manufacturing operation. This cargo is unloaded from ships which are leased by the company and which carry no commercial cargo on the same incoming voyage. The cargo is unloaded at the company's private facilities adjacent to its manufacturing plant. Furthermore, respondent unions' collective bargaining agreement with PMA specifically exempts from coverage a non-member of PMA, such as the company, who "has control over the cargo at its premises or on its vessels."

While there are factual distinctions between this case and the jurisdictional dispute involved in N.L.R.B. v. International Longshoremen's & Warehousemen's Union (U. S. Steel Corp.), 9 Cir., 378 F.2d 33, the work assignment problem presented was essentially the same. In the section 10(k) order entered in that proceeding, the Board awarded the ship unloading work to company employees represented by the United Steelworkers of America, AFL-CIO. We affirmed, holding that the Board's determination should be enforced.

We reach the same conclusion here. We think the Board's determination of this jurisdictional dispute evidences a full and considered evaluation of the relevant factors and, in our opinion, that determination was not arbitrary or capricious.

In our opinion, however, the cease and desist order and the form of notice which the respondent unions are required to post should be modified in one particular. Each now refers to "the work of the unloading of the said Company's ships at its dock in Vancouver. * * *" We think the cease and desist order should be changed to read "the work of the unloading of company-owned alumina from the said company's ships at its dock in Vancouver for use in the company plant * * *."

The modified language should not preclude the unloading of an inconsequential amount of company-owned cargo other than alumina, brought in with an alumina cargo. It would, however, foreclose any misunderstanding of the fact that the basic unloading work assigned to employees represented by the Aluminum Workers is that of removing company-owned raw material, alumina, from the holds of company-controlled vessels used only for such cargo on the inbound voyage, such unloading to take place only at the company's Vancouver Works.

As so modified, the Board order will be enforced.