**CONSTRUCTION EMPLOYERS' ASSO-CIATION OF TEXAS, et al.**

v.

**INTERNATIONAL UNION OF OPER-ATING ENGINEERS, LOCAL 450, AFL–CIO.**

**Civ. A. No. 66–H–411.**

United States District Court
S. D. Texas,
Houston Division.

July 10, 1969.

Baker, Botts, Shepherd & Coats, V. R. Burch, Jr., and William R. D'Armond, Houston, Tex., for plaintiffs.

Combs & Mitchell, W. A. Combs, Houston, Tex., for defendant.

## MEMORANDUM AND ORDER OF DISMISSAL

GARZA, District Judge.

This is an action brought under Section 303 of the National Labor Relations Act (the Act), 29 U.S.C.A. § 187, in which the Plaintiffs allege that the Defendant Union violated the Act by picketing Gate 38 of Plaintiff The Dow Chemical Company's Plant B at Freeport, Texas, on March 23 and 24, 1966, in support of certain alleged objectives which are more fully set out hereinafter.

The Defendant admits that the picketing occurred, but denies that it was unlawful.

The cause was tried by the Court on April 14 and 15, 1969, on the issue of liability only. After hearing the evidence presented, the parties were allowed to submit briefs.

The Plaintiffs in this cause are The Dow Chemical Company which operates two large industrial plants in Freeport, Texas, and ten companies that do construction work or perform maintenance service in the Dow plants.

The Defendant Operating Engineers, Local 450, is a labor organization which represents a number of employees of various companies that perform work in the Dow plants.

The Plaintiff Contractors are engaged in the business of industrial construction, or maintenance work, or supplying materials or equipment, or rendering services relating to such work, and are in a non-profit association which has as its members various industrial contractors, including most of the Plaintiff Contractors. The Association, which is a corporation, represents its members in bargaining with various unions, including Local 450. At all times relevant to this case the Association and Local 450 have been parties to a collective bargaining agreement.

The operations of the Plaintiff and the Defendants are conducted in interstate commerce, and such operations substantially affect interstate commerce, and the rights of the parties in this litigation are governed and controlled by the laws of the United States with reference to interstate commerce.

On or about March 19, 1966, Ashley-Hickham Maintenance and Engineering Company (hereinafter called "Ashley-Hickham") began certain maintenance and repair work on Turbine Generator Unit No. 2, Power Plant No. 4, in Dow's Plant B. Ashley-Hickham engaged in this work under a subcontract between it and General Electric Company who had the main contract with Dow to do such work. The work being done by Ashley-Hickham required the use of a permanently installed overhead crane which is owned by Dow. The crane can be operated either from the cab or from the ground by a pendant control, a switch mechanism at the end of an electrical cable hanging from the crane.

At the time this work was being performed and for several years prior thereto, as far back as 1964, Ashley-Hickham recognized and had a labor contract with Millwrights Local Union No. 2232, and employed a number of employees who were members of or represented by that labor organization. These employees will hereinafter be called "Millwrights".

Ashley-Hickham had done some like jobs for Dow, which required the use of the overhead crane, during the preceding years, and had used the Millwrights to operate the crane on some seven prior occasions. At the time of the picketing complained of, Ashley-Hickham had no labor contract with Defendant Local 450 and had no employees on its payroll who were members of ,or represented by Lo-

cal 450 which had jurisdiction in the area of the Dow Plants at Freeport.

On more than one occasion, both before and after Ashley-Hickham began its work around March 19, 1966, representatives of Local 450 requested of representatives of Dow, General Electric and Ashley-Hickham that the operation of the crane in question be assigned to an operating engineer of Local 450.

The evidence is in dispute as to the actual conversations or demands of the Defendant Operating Engineers, but suffice it to say that regardless of what the exact demands were, none of them were honored by Ashley-Hickham who continued to have Millwrights operate the crane when needed.

The contract of Ashley-Hickham with the Millwrights did not provide that the Millwrights would operate the crane in question.

Mr. B. C. Ashley, of Ashley-Hickham, testified by deposition that there was no actual understanding between it and Dow that Millwrights would be used on the job to operate the crane, but that Dow only demanded that if the crane was operated from the cab, Ashley-Hickham would use an operating engineer employed by Dow.

The evidence is abundant that the Millwrights had always operated the crane by using the pendant controls, not only before the picketing but many times thereafter.

Mr. Ashley has testified that it was area practice for the Millwrights to operate the crane in question as a tool of the trade.

On March 23, 1966, at approximately 7:00 a. m., Local 450, through its duly authorized representatives and agents, established a picket line at Dow's Gate 38, a construction gate then being used by employees of Ashley-Hickham and all of the Contractor Plaintiffs with the exception of Monical & Powell, Inc., and the electrical contractors. The picketing was peaceful, and the picket signs contained the following language:

"ASHLEY-HICKHAM
MAINT. & ENGR. INC.
DOES NOT EMPLOY NOR
HAVE A CONTRACT WITH
LOCAL UNION 450
OPERATING ENGINEERS"

Union members then using such gate failed or refused to cross the picket line, and did not report to work, with the exception of the Millwrights employed by Ashley-Hickham who had entered the plant before the picket line was established, and who reported to their jobsite. However, when the Millwrights learned of the picketing they left the plant. The picketing continued until approximately 4:00 p. m. on March 23rd, and resumed the following morning at 7:00 a. m., at which time Union employees using Gate 38 again failed or refused to cross the picket line. The picketing was discontinued at approximately 9:30 a. m. on March 24, 1966, and by the following day operations within Plant B were again back to normal.

Some thirteen hundred employees of the Plaintiffs were affected by the pickets.

There is no question that the failure to use an operating engineer on the crane in question was for economic reasons. It seems that when an operating engineer operates the crane he does so from the cab, and a person has to be on the ground to direct the movements of the crane by passing on by signs information to the operating engineer. On a pendant-controlled crane, the person operating the switches is on the ground and no one is needed to relay signs regarding the movement of the crane.

It is alleged, and I find, that during the beginning and ending of a job such as Ashley-Hickham was doing, the crane is used about seventy-five per cent (75%) of the time, but in between while the actual maintenance work is being done the crane is used very sparingly and no more than five to ten per cent (5 to 10%) of the time.

Plaintiffs allege that the hiring of an operating engineer under these circumstances would amount to featherbedding, as the millwright who operated the crane from the pendant controls would still have to be on the job to direct the movements of the crane while an operating engineer was in the cab.

The Plaintiffs are suing for damages, claiming that the picketing in question was illegal and in violation of Section 8(b) (4) (D) of the National Labor Relations Act, 29 U.S.C.A. § 158(b) (4) (D), which violation would support an action for damages brought under Section 303 of the Act, 29 U.S.C.A. § 187.

The Plaintiffs' main contention is that by demanding that Ashley-Hickham be required to assign operation of the overhead crane to Operating Engineers or to bargain and sign a contract with Local 450, a violation of Section 8(b) (4) (D) of the Act occurred.

The Union, on the other hand, contends that the picketing was not unlawful and was solely for organizational purposes and in an effort to induce Ashley-Hickham to enter into a collective bargaining agreement with Local 450 which would provide for the employment of members of Local 450 in the operation of the overhead crane, and guarantee the payment of benefits to them under the Union's Pension and Welfare Fund.

There is no question that one of the objects of the picketing by Operating Engineers was to have the Millwrights that were operating the crane in question replaced by an operating engineer, and this, the Plaintiffs say, is sufficient to sustain a claim for damages under § 8(b) (4) (D) of the Act.

The testimony is in conflict as to whether the business agents of Local 450 ever demanded a contract, but the picket sign itself showed that Local 450 was complaining of not having a contract with Ashley-Hickham.

One of the factual disputes in this case has to do with whether or not the Millwrights were claiming the right to operate the crane. Evidence before the Court shows clearly that the Millwrights complained to Ashley-Hickham when iron workers were allowed to operate the crane.

Shortly before the commencement of the job in question, Mr. Ashley inquired of Jack O. Fountain, who at that time was the business representative of Millwrights Local 2232, what would happen if the Operating Engineers took action to demand the operation of the crane, and Fountain informed Ashley that if that time ever came they would find a way to claim the work.

There is no question that Fountain had told officials of Operating Engineers that the Millwrights were claiming the right to operate the crane as a tool of their trade.

Fountain explained the actions of the Millwrights by explaining that they knew that the operation of the crane belonged to the Operating Engineers, but that they many times made such claims so as to get concessions from other unions on other matters.

From all the evidence, a finding that the Millwrights were claiming the right to operate the crane in question can be made.

The paramount question, however, is whether the claim being made by the Millwrights was of such a nature as to make it a bona fide jurisdictional dispute between the Millwrights and the Operating Engineers.

If one reads § 8(b) (4) (D) by itself, there is no question but that Plaintiffs could recover in this case. However, a reading of the Act, and especially its amendments of 1947, shows clearly that § 8(b) (4) (D) of the Act was not what it would seem to be, reading it apart from the rest of the Act, for at the same time that § 8(b) (4) (D) was passed Congress also passed § 10(k), 29 U.S.C. A. § 160(k), which provided for the National Labor Relations Board to settle jurisdictional disputes.

That § 8(b) (4) (D) cannot be looked to by itself, but must be read in conjunction with § 10(k) of the Act, has

been made abundantly clear. National Labor Relations Board v. Radio and Television Broadcast Engineers Union, Local 1212, International Brotherhood of Electrical Workers, AFL–CIO, 364 U.S. 573, 81 S.Ct. 330, 5 L.Ed.2d 302.

Both sides to this dispute have cited the Court many cases, none of which are on all fours with ours. A thorough reading of all the cases cited, and a reading of the Act itself has led this Court to reach the following conclusion:

The amendments to the Act of 1947, and especially §§ 8(b) (4) (D) and 10(k) of the Act, were devised to prevent an employer from being caught in the middle of a genuine jurisdictional dispute between two groups of employees, union or not.

The Taft-Hartley Act itself and the proceedings in Congress during its amendment in 1947 show clearly that the right of unions to picket was not to be lightly taken away because of the Act or its amendments.

There is no evidence in this case that the Millwrights ever told Ashley-Hickham that if the Operating Engineers were given the job of operating the crane, they themselves would strike. In fact it is abundantly clear that the Millwrights honored the picket of the Operating Engineers.

Plaintiffs allege that at the beginning Fountain did not even know why the picket was put up, but it seems inconceivable that during the course of the picketing the Millwrights did not find out why the pickets were up.

I find, therefore, that under the Act, the protection and claim for damages by an employer under § 8(b) (4) (D) can only be resorted to in a genuine jurisdictional dispute where two sides of employees inform the employer that they will strike if the work is given to the other, or the employer is under contract to assign the work to a particular group. In other words, § 8(b) (4) (D) of the Act cannot be read literally. If it could, there is no question but that the Plaintiffs in this case would have a good cause of action and would prevail.

No case that has been cited to this Court has made the finding that is being made here, but it is a finding which is made necessary by the Act and the cases.

If this finding is correct and the Congress intended to give employers a remedy which a literal reading of § 8(b) (4) (D) apparently intended to give them, the door is open for action by the Congress.

If this finding does not withstand appellate review, then it is clear that actions such as the action of Operating Engineers under the facts here will be compensable.

The above constitute the Findings of Fact and Conclusions of Law of the Court.

Finding that under the facts Defendant Operating Engineers did not violate § 8(b) (4) (D) of the Act;

It is, therefore, ordered, adjudged and decreed that this cause be, and the same is hereby dismissed.

Clerk will send copies of this Memorandum and Order of Dismissal to counsel for the parties.