Francis W. HOEBER, Acting Regional Director of the Fourth Region of the National Labor Relations Board, for and on behalf of the National Labor Relations Board

v.

**INTERNATIONAL BROTHERHOOD OF ELECTRICAL WORKERS LOCAL 98.**

Civil Action No. 97–2673.

United States District Court, E.D. Pennsylvania.

April 23, 1997.

Carmen P. Cialino, Jr., National Labor Relations Board, Region Four, Philadelphia, PA, for plaintiffs.

Larry Rappaport, Stevens and Lee, Wayne, PA, for intervenor, Reliable Telecom, Inc.

Richard C. McNeill, Sagot, Jennings and Sigmond, Philadelphia, PA, for defendants.

## MEMORANDUM

DALZELL, District Judge.

### I. *Factual Background*

This is a dispute between two unions. Respondent Local 98 and Local 1448, both of the International Brotherhood of Electrical Workers ("IBEW"), are both competing to have their respective members install tele-

phone, teledata, etc. wiring in the 280,000 square feet PNC Bank Regional Data Center building project ("PNC building") currently under construction at 8801 Tinicum Boulevard, Philadelphia, near the Philadelphia International Airport. The NLRB charges that Local 98 has committed certain unfair labor practices, *see infra* II, by threatening to engage in a work stoppage on the construction site.

L.F. Driscoll Company ("Driscoll") is the general contractor on the PNC building. Driscoll has sub-contracted the installation of voice and data wiring to Reliable Telecom, Inc. ("the sub-contracted work").[1]

Reliable has a collective bargaining agreement with Local 1448, based in Norristown, Pennsylvania, and thus assigned the subcontracted work to Local 1448's members. Local 98, based in the City of Philadelphia, has, however, objected to Reliable's assignment of the sub-contracted work to Local 1448.[2]

On March 11, 1997, John Dougherty, Local 98's business manager, called Joseph Culbertson, Reliable's Vice President, and requested that Reliable hire Local 98's members for the sub-contracted work. According to the NLRB, "Culbertson expressed a willingness to do so." Pet.'s Mem. of Law at 5.

On March 24, 1997, Mr. Culbertson, prior to arriving at the PNC building site with Local 1448 members ready to start work, received a page on his beeper from Local 98's business agent, Edward Coppinger,[3] who informed him that *only* Local 98 members could work on the PNC building. *See id.* That same day, Mr. Coppinger, on behalf of Local 98, informed Thomas Tobin, Driscoll's assistant project manager, that if Reliable performed the sub-contracted work with Local 1448 members, Local 98 would pull its members (totalling between fifty and seven-

---

1. The parties have stipulated that both Driscoll and Reliable are both engaged in interstate commerce as defined by the National Labor Relations Act (the "Act").

2. In the past, Reliable has had similar conflicts with Local 98, and in an effort to avoid labor unrest, Reliable has hired members from *both* Local 98 and Local 1448 to work on "composite crews." *See* Testimony of Joseph J. Culbertson.

This practice has, according to the NLRB, "created an expectation that Reliable would enter into a contractual arrangement with [Local 98], but to date, Reliable has not done so." Pet.'s Mem. at 5.

3. The parties have stipulated that Messrs. Dougherty and Coppinger are agents of Local 98 within the meaning of §§ 2, 8(b) and 10(*l*) of the Act.

ty-five members) off the rest of the building project. This would be catastrophic to the project, since the electrical subcontractor, Harry F. Ortlip, which employs members of Local 98, is by far the largest and most important to this very large project, which is promised to be· ready for at least partial occupancy by PNC personnel in mid-July. If Local 98's threat is carried out, other trades would not be able to continue working on the site and deadlines to Driscoll would be missed. Ms. Margaret A. Cowan, Driscoll's senior project manager, thus credibly testified at the hearing today that, "I could not afford to stop the electrical work in order to commission the project on time." *See also* Testimony of Thomas J. Tobin, III, Driscoll's assistant project manager (credibly testifying that it would be "devastating" if Ortlip's electricians walked off the site).

Mr. Tobin, on behalf of Driscoll, consequently told Reliable that it would not be permitted to do the sub-contracted work until it resolved its labor problems. Since March 24, Reliable has not performed the work which it was contracted to do at the site.

On March 26, 1997, Reliable filed a complaint before the NLRB charging unfair labor practices—cases nos. 4–CC–2149 (the "CC" charge) and 4–CD–953 (the "CD" charge). The Regional Office of the Board has found merit to these charges. *Id.* With regard to the CD charge, it is reported that the "Acting Regional Director issued a Notice of Hearing on April 17, 1997 . . ." for May 13. *Id.* As to the CC charge, "the Region will issue [a] Complaint . . . shortly, and establish a separate hearing." *Id.*

On April 22, 1997, Judge Padova, as Emergency Judge, signed an *ex parte* Order to Show Cause, setting an injunction hearing for this day. After hearing the testimony of three witnesses, we have concluded that the Board is entitled to its injunction.

## II. *Legal Analysis*

### A. *Relief Sought: Injunction Pursuant to § 10(l)*

The Board seeks, pursuant to § 10(l) of the Act, a *temporary* injunction against Local 98 pending the Board's final disposition, pursuant to § 10(k) of the Act, of the charges Reliable has filed against Local 98.

The NLRB's authority to seek injunctive relief in federal court is explicitly provided in § 10(l) of the Act, which requires an NLRB officer or regional attorney with "reasonable cause" to believe that a charge of unfair labor practice is true to seek injunctive relief pending final adjudication by the Labor Board of the charge alleged. Section 10(l) also states that a district court that receives such a petition may grant such injunctive relief as it deems "just and proper."

█ Our Court of Appeals has set forth the requirements for obtaining injunctive relief under ·§ 10(l) in *Hoeber for and on Behalf of the NLRB v. Local 30,* 939 F.2d 118 (3d Cir.1991). In *Hoeber,* the Court stated that in determining whether "reasonable cause" is present, the district court must make two inquiries.

First, it must be shown that the Labor Board has "a substantial legal theory explicit or implicit in the case that would support a finding that an unfair labor practice had occurred." *Id.* at 123. This merely requires a showing that the NLRB's legal theory is "substantial and nonfrivolous." *Id.* at 124; *see Hirsch v. Building & Constr. Trades Council,* 530 F.2d 298, 302 (3d Cir.1976) ("[T]he Regional Director faces a relatively insubstantial burden of proof when he petitions a district court for temporary injunctive relief pursuant to § 10(l).").  Second, if a substantial legal theory is found, the district court must determine whether the facts satisfy the theory. *See id.*

█ Our task here is quite limited. It is emphatically not to reach a final adjudication of this "jurisdictional dispute." Pursuant to § 10(k) of the Act, the NLRB will determine to whom the sub-contracted work belongs to and will award the work accordingly. *See NLRB v. Radio Broadcast,* 364 U.S. 573, 576, 81 S.Ct. 330, 332–33, 5 L.Ed.2d 302 (1961).

█ The final step in our analysis is ascertaining whether an injunction would further the Congressional policy behind the enactment of § 10(l), which is "the prompt elimi-

nation of the obstructions to the free flow of commerce and encouragement of the practice and procedure of free and private collective bargaining." *Hoeber*, 939 F.2d at 126; *id.* (section 10(*l*) is "designed to prevent disruptions which threaten a danger of harm to the public"); *see also Wilson v. Milk Drivers & Dairy Employees Union*, 491 F.2d 200, 203 (8th Cir.1974) ("Section 10(*l*) reflects a Congressional determination that the unfair labor practices enumerated therein [*see infra* II.B.] are so disruptive of labor-management relations and threaten such danger of harm to the public that they should be enjoined whenever a district court has been shown reasonable cause to believe in their existence and finds that the threatened harm or disruption can best be avoided through an injunction.").

**B.** *Reliable Has Filed Two Unfair Labor Practice Charges Against Local 98*

**1.** *Section 8(b)(4)(ii)(D) of the Act*

Reliance has charged that Local 98 has violated subparagraph (D) of § 8(b)(4)(ii) of the Act, which provides that:

(b) It shall be an unfair labor practice for a labor organization or its agents to—

(4)(ii) to threaten, coerce, or restrain any person engaged in commerce or in an industry affecting commerce, where ... an object thereof is—

\*    \*    \*    \*    \*    \*

(D) forcing or requiring any employer to assign particular work to employees in a particular labor organization or in a particular trade, craft, or class rather than to employees in another labor organization or in another trade, craft, or class....

■ The threat of a work stoppage, even if not carried out, constitutes conduct proscribed by paragraph (ii). *See Hirsch v. Local Lodge 724 of the Int'l Assoc. of Machinists Workers*, No. 91–7518, 1992 WL 6753, at \*9 (E.D.Pa. Jan. 14, 1992); *Zurlnick v. International Bhd. of Elec. Workers, Local 98*, 360 F.Supp. 1197 (E.D.Pa.1973).[4] That threat has to this date been completely effec-

tive. Accordingly, the NLRB charges are well-founded that Local 98 and its agents have threatened to cause a work stoppage (a violation of paragraph (ii)) if Local 98 members are not assigned all of Reliable's subcontract work (an impermissible object in violation of subparagraph (D)). *See supra* 177–178 (March 24 threat directed at Driscoll).

**2.** *Section 8(b)(4)(ii)(B) of the Act*

In addition, Reliance has charged that Local 98 has violated subparagraph (B) of § 8(b)(4)(ii) of the Act, which provides that:

(B) forcing or requiring any person to cease using, selling, handling, transporting, or otherwise dealing in the products of any other producer, processor, or manufacturer, or to cease doing business with any other person, or forcing or requiring any other employer to recognize or bargain with a labor organization as the representative of his employees unless such labor organization has been certified as the representative of such employees under the provisions of section 159 of this title: Provided, That nothing contained in this clause (B) shall be construed to make unlawful, where not otherwise unlawful, any primary strike or primary picketing.

■ The intent underlying subparagraph (B) is to shield unoffending employers and others from pressures in controversies not their own. *See NLRB v. Denver Building Council*, 341 U.S. 675, 682, 71 S.Ct. 943, 948, 95 L.Ed. 1284 (1951). As the Ninth Circuit explained in *NLRB v. Northern Cal. Dist. Council of Hod Carriers*, 389 F.2d 721, 725 (9th Cir.1968):

This section proscribes *secondary* activity, but by its express proviso allows for primary activity even though such activity may indirectly affect a secondary employer. Thus, the crucial question in this type of case is always to determine the object of the labor activity. If it is primary, in other words directed only at the employer with whom the union has a bona fide labor

---

4. It appears that Local 98 is not a stranger to unfair labor practice cases of this nature in our

court.

dispute, then it may be lawful even though some neutral or secondary employers might be affected. Conversely, if its object is to bring indirect pressure on the primary employer by involving neutral or secondary employers and their employees, then it may be unlawful.

■ Here, Reliable is the primary employer and Driscoll, the secondary. According to the NLRB, "Respondent has a primary labor dispute with Reliable, as Reliable has refused to employ all of Local 98's members at the PNC project for the wiring work. Driscoll is a neutral to that dispute and should be insulated from any coercive conduct foisted upon it by Local 98." Pet.'s Mem. of Law at 17. The evidence before us certainly confirms these averments. In short, Driscoll's innocent, middleman involvement in this dispute between Local 98 and Reliable is a violation of subparagraph (B).

    \*     \*     \*     \*     \*     \*

Clearly, the injunction should issue. The NLRB has a substantial legal theory to support its belief that Local 98 is engaging in unfair labor practices in violation of subparagraphs (D) and (B) of section 8(b)(4)(ii). In addition, on the facts the NLRB has proved, there is unquestionably "reasonable cause" to believe that Local 98 is engaging in unfair labor practices.

Our Order granting relief follows.

## ORDER

AND NOW, this 23rd day of April, 1997, upon consideration of the petition of the National Labor Relations Board (the "NLRB") for temporary injunctive relief, the evidence adduced at the hearing this day on the petition, the memorandum of law the NLRB has submitted, the respondent's answer thereto, and for the reasons set forth in the accompanying Memorandum constituting the Court's Findings of Fact and Conclusions of Law, it is hereby ORDERED that:

1. The NLRB's petition is GRANTED;

2. Pending the final disposition of this case before the NLRB, respondent Local 98, its officers, agents, servants, employees, and attorneys, and those persons in active concert or participation with them, who receive actual notice of this Order by personal service or otherwise, are hereby ENJOINED and RESTRAINED from in any manner, or by any means, threatening, coercing, or restraining any members of Local 1448 of the International Brotherhood of Electrical Workers, or employees or officers of L.F. Driscoll Company ("Driscoll") and Reliable Telcom, Inc., where a purpose thereof is to force or require Driscoll to assign the telephone, teledata, and related wiring installation at the PNC Bank Regional Data Center building at 8801 Tinicum Boulevard, Philadelphia to employees who are members of, or who are represented by, Local 98 of the International Brotherhood of Electrical Workers, rather than to employees who are members of, or who are represented by, Local 1448; and

3. The Clerk shall CLOSE this matter statistically.