420 F.2d 802
 Charles M. HENDERSON, Regional Director of Region 19 of the National Labor Relations Board, for and on Behalf of the NATIONAL LABOR RELATIONS BOARD, Appellee,
v.
INTERNATIONAL UNION OF OPERATING ENGINEERS, LOCAL 701, Appellant.
 No. 24285.
 United States Court of Appeals Ninth Circuit.
 December 11, 1969.
 
 COPYRIGHT MATERIAL OMITTED Don S. Willner (argued), of Willner, Bennett & Leonard, Portland, Or., for appellant.
 Julius G. Gerot (argued), Marcel Mallet-Prevost, Asst. Gen. Counsel, N. L. R. B., Washington, D. C., Richard Ernst and Dennis Daniels, Gladstein, Anderson, Leonard & Sibbett, San Francisco, Cal., Dale B. Cubbison, Atty., N. L. R. B., Frank H. Pozzi, Marshall C. Cheney, Jr., Portland, Or., for appellee.
 Before HAMLEY and HUFSTEDLER, Circuit Judges, and LEVIN, District Judge.*
 HAMLEY, Circuit Judge:
 
 
 1
 This is an appeal from a district court order granting a temporary injunction pursuant to a petition filed on behalf of the National Labor Relations Board (Board) under section 10(l) of the National Labor Relations Act, as amended (Act), 29 U.S.C. § 160(l).
 
 
 2
 The essential facts are not in dispute and the summary thereof, set out below, is taken largely from the Board's brief on this appeal. Pacific Maritime Association (PMA) is an association of employers engaged in shipping, stevedoring and terminal business at ports in California, Oregon and Washington. Among it members are Brady Hamilton Stevedore Company (Brady) and W. J. Jones & Sons, Inc. (Jones), both of which are engaged in loading logs on vessels at the Port of Astoria, Oregon. Both employ longshoremen who are members of, or are represented by International Longshoremen's and Warehousemen's Union Local 50 (Longshoremen). PMA and Longshoremen are parties to an existing collective bargaining agreement the terms of which are binding upon Brady and Jones.
 
 
 3
 Since November, 1966, Brady has leased waterborne cranes, also known as floating whirley cranes, from Willamette-Western Corporation (Willamette) under bareboat charter agreements, for use in Brady's Astoria operations. Under these arrangements, Willamette provided Brady with employees to man the cranes. These employees were furnished to Brady on a "loaned" basis, and during the time of such "loan," they were to be "deemed for all purposes the employees of [Brady]." The employees received their wages from Willamette, which billed Brady for "labor costs referable to such employees." Pursuant to similar arrangements, Jones leased water-borne cranes from General Construction Company (General) for use by Jones in its Port of Astoria operations.
 
 
 4
 The crane operators and oilers furnished by Willamette and General under these arrangements were members of, or represented by, International Union of Operating Engineers Local 701 (Engineers). Willamette is a party to a collective bargaining agreement with Engineers, and General is bound by a collective bargaining agreement between Engineers and Associated General Contractors of America, an employer-association. Neither Willamette nor General has ever been a party to a collective bargaining agreement with Longshoremen. At no material time has Engineers been certified by the Board as the collective bargaining representative of the employees of Brady or Jones; nor has Longshoremen been certified as the bargaining representative of the crane operators employed by Willamette, General, Brady or Jones.
 
 
 5
 On the morning of April 3, 1969, crane operators engaged in Brady's and Jones' operations at Astoria swung the cranes into position preparatory to loading logs aboard ships. At this point the longshoremen employed by Brady and Jones refused to hook up the logs to the crane hooks, thereby bringing the operations to a halt. The longshoremen claimed that they, rather than the employees represented by Engineers, were entitled to the work of operating the water-borne cranes. They engaged in this work stoppage in furtherance of that claim.
 
 
 6
 Brady and Jones capitulated to the longshoremen's demand and, that same day, told the employees who had been furnished by Willamette and General to leave the barges so that the longshoremen could take over. Brady and Jones then resumed loading the logs by utilizing ship's gear operated by the longshoremen until the latter could be trained to operate the water-borne cranes.
 
 
 7
 Engineers made several efforts to have Brady restore employees represented by Engineers to work on the waterborne cranes. Being unsuccessful in this, Engineers filed with the Board, on April 8, 1969, the unfair labor practice charge which gave rise to the instant proceeding. Engineers alleged, in effect, that Longshoremen had violated section 8(b) (4) (D) of the Act, 29 U. S.C. § 158(b) (4) (D) by utilizing a work stoppage to force Brady to assign the disputed work to employees represented by Longshoremen.
 
 
 8
 On April 19, 1969, Engineers commenced picketing Brady's operations in the Port of Astoria. This led PMA to file with the Board on April 21, 1969, an unfair labor practice charge against Engineers, the second charge involved in this proceeding. PMA alleged that Engineers' picketing was in violation of section 8(b) (4) (D) of the Act insofar as it was intended to force PMA members engaged in stevedoring operations at Astoria to assign the work of operating water-borne cranes to employees represented by Engineers.
 
 
 9
 Engineers then demanded that Jones restore employees represented by Engineers to work on the water-borne cranes. Being again unsuccessful, Engineers, on April 23, 1969, filed the third and last unfair labor practice charge growing out of the Astoria incident described above. This charge was similar to the charge Engineers had filed against Brady on April 8, 1969.
 
 
 10
 In the meantime, on April 22, 1969, Engineers extended its picketing to Brady's operations in Portland, Oregon. Engineers also continued picketing activity in Astoria on April 23 and 24, 1969. This picketing activity resulted in work stoppages by tugboat personnel at Astoria and by construction employees and employees of the Dock Commission at Portland.
 
 
 11
 After investigation, the Board concluded that there was reasonable cause to believe that both Engineers and Longshoremen were violating section 8(b) (4) (D) and that a notice of hearing based on the three charges referred to above should issue pursuant to section 10(k) of the Act, 29 U.S.C. § 160(k). The Board also concluded that an application for injunctive relief against both unions under section 10(l) of the Act, 29 U.S.C. § 160(l), was appropriate.
 
 
 12
 Accordingly, on May 6, 1969, acting on behalf of the Board, Charles M. Henderson, Regional Director of Region 19 of the Board, filed a petition for an injunction in the district court. Answers were filed by Engineers and Longshoremen. PMA filed a "Supplementing Petition of Charging Party," agreeing with the Board insofar as the latter sought an injunction against Engineers. Numerous affidavits were filed, followed by oral argument.[1]
 
 
 13
 The district court found reasonable cause to believe that Longshoremen, by its work stoppage of April 3, 1969, violated section 8(b) (4) (D) of the Act. The court also found that Engineers, by its picketing on and after April 19, 1969, engaged in conduct proscribed by section 8(b) (4) (D) in order to force Brady and Jones to assign the work of operating the water-borne cranes to employees represented by Engineers. The district court concluded that "continuation of these practices will impair the policies of the Act," and that an order enjoining both unions "is appropriate, just and proper * * * (t)o preserve the issues for the orderly determination as provided in the Act."
 
 
 14
 The court enjoined each union, pending disposition of the unfair labor practice charges by the Board, from engaging in conduct proscribed by section 8(b) (4) (D). Thus, no conduct would be permitted which could require or force Brady, Jones or any other employer-member of PMA, or any other employer in the Astoria area, to assign the work in question to employees who are members of or are represented by one union rather than the other union. Only Engineers has appealed.[2]
 
 
 15
 Engineers argues that its picketing activity against Brady was lawful because it was for the sole purpose of protesting Brady's wrongful action in discharging the crane operators represented by Engineers. According to this view, the picketing activity against Brady did not have a jurisdictional objective and the jurisdictional proceeding before the Board would continue without interference. Engineers urges that they were only exercising the right of free speech. In essence, what Engineers is saying is that its picketing against Brady was not for the purpose of effectuating a permanent solution of the jurisdictional dispute in its favor, but merely for the purpose of restoring to their jobs crane operators represented by Engineers while the Board is resolving the jurisdictional dispute.
 
 
 16
 We agree with the district court and the Board that the objectives of picketing may not be segmented in this fashion. Section 8(b) (4) (D), with exceptions not here relevant, makes it an unfair labor practice to engage in picketing where an object thereof is to force or require an employer to assign particular work to employees in a particular labor organization. The statute draws no distinction between a purpose to accomplish a permanent assignment of employees and a purpose to accomplish a temporary reassignment in the form of a restoration to former employment pending a permanent solution of the problem.
 
 
 17
 The reason why no such distinction is drawn in the statute is apparent. Whether the objective is temporary or permanent replacement of employees, the employer is caught in the middle between two competing unions. Picketing by one union to force an employer to displace employees represented by another union for the purpose of reinstating employees represented by the picketing union, is as detrimental to the employer and the public as is picketing to accomplish a permanent realignment. Thus to permit Engineers to picket Brady on the theory that it has a right to protest the alleged wrongful discharge of its members would frustrate the Congressional scheme of promoting orderly resolution of such disputes.
 
 
 18
 Assuming, as Engineers contends, that its crane operators had a contractual right to the work in question, this would not make the dispute any the less a jurisdictional dispute within the meaning of section 8(b) (4) (D). See N. L. R. B. v. Radio, etc., Engineers, 364 U.S. 573, 579, 584, 81 S.Ct. 330, 5 L.Ed.2d 302 (1961). Any contract rights Engineers may have in this respect will be relevant factors to be considered by the Board in resolving the underlying jurisdictional dispute. See International Assn. of Machinists, Lodge 1743, 135 NLRB 1402, 1410-1411 (1962).[3]
 
 
 19
 Appellant contends that, apart from the posting of a banner against Jones for about one hour on the morning of April 23 or 24, the evidence shows no picketing or other coercive activity against the company. Accordingly, Engineers urges that the district court erred in not excluding Jones from the scope of the injunction.
 
 
 20
 While Engineers picketed Jones for only a brief time, Engineers, Longshoremen and the employers all regarded the dispute as involving Jones as well as Brady. The arbitration proceedings between PMA and Longshoremen were initiated by Jones. Engineers made written demands upon Jones as well as Brady for reinstatement of its crane operators. The jurisdictional controversy involving the two companies arose at the same time, encompassed the same issues and involved the same unions. Under these circumstances we believe that the district court was warranted in formulating injunctive relief without distinguishing between Brady and Jones. If Engineers has no intention of picketing Jones it is not aggrieved by the order insofar as it forbids picketing against that company.
 
 
 21
 Engineers argues that the district court erred in granting injunctive relief because Brady and Jones, who benefit by the decree, have unclean hands. In support of this view, Engineers asserts that both Brady and Jones violated section 8(a) (3) and (5) of the Act, 29 U.S.C. § 158(a) (3) and (5), when they discharged the crane operators represented by Engineers. In particular, Engineers asserts that Brady: (1) did not follow procedures available to it under the contract with Longshoremen which provide for arbitration; (2) did not follow procedures available to it under the Act to seek an immediate injunction against Longshoremen pursuant to section 10(l); and (3) fired the experienced and skilled crane operators represented by Engineers and replaced them with unskilled trainees.[4]
 
 
 22
 Whether Brady or Jones violated section 8(a) (3) or (5), or acted unlawfully in any other respect, are factors to be considered in the unfair labor practice proceeding now pending before the Board. Neither the district court nor this court should prejudge that issue in this injunction proceeding under section 10(l). Moreover, if it be assumed that Brady or Jones did engage in unfair labor practices by violating section 8(a) (3) or (5), or otherwise, injunctive relief under section 10(l) would not thereby be foreclosed. In the present case, the Board, and not Brady or Jones, is the petitioner seeking the injunction. The Board is acting, not on behalf of the employers or either union, but in the public interest. In our opinion the "unclean hands" defense is not available against the Board under the facts of this case.
 
 
 23
 Closely akin to this argument is Engineers' contention that to issue an injunction against it under the circumstances of this case would reward the "illegal force" used by Longshoremen and is therefore unconscionable. The thrust of this argument, insofar as it is distinguishable from Engineers' "unclean hands" argument, seems to be that the injunction under review does not preserve, but in fact thwarts the return to, the status quo pending the Board decision in the unfair labor practice proceedings.
 
 
 24
 Engineers cite Westinghouse Electric Corp. v. Free Sewing Machine Co., 256 F.2d 806, 808 (7th Cir. 1958), for the proposition that the status quo is the last uncontested status which preceded the pending controversy. Engineers urges that restoration of the status quo in this case would require that the crane operators represented by Engineers be restored to their jobs with Brady and Jones pending the Board decision. As authority for the proposition that a section 10(l) injunction should not be framed that would disturb the status quo, Engineers cites Minnesota Mining and Mfg. Co. v. Meter, 385 F.2d 265 (8th Cir. 1967).
 
 
 25
 The injunction under review runs against both Engineers and Longshoremen. It does not award the work to either union. It leaves Brady and Jones free, under the protection of the injunction, to assign the work to either union, pending the Board's determination in the unfair labor practice proceeding. If Brady and Jones decide to replace Longshoremen's crane operators with those of Engineers, the injunction protects those employers, Engineers, and the public, from coercive activity by Longshoremen.
 
 
 26
 Had the district court enjoined only the Longshoremen and left the Engineers free to strike, this would have amounted to an award of the work to Engineers. As before stated, it is for the Board to make this award in the first instance. We agree with the Board's view, as expressed in its brief on this appeal, that the Congressional intent in enacting section 10(l) was not, as Engineers contend, to restore the status quo ante litem of the employees, but to prevent disruptions to commerce as a result of jurisdictional strikes and other unfair labor practices covered by that section.
 
 
 27
 Moreover, if status quo is a consideration at all in section 10(l) cases, the status quo to be preserved is the employer's right to make work assignments without being subjected to continuing strike pressure, pending a Board decision in the unfair labor practice proceedings. That status quo is maintained by the injunction here in question.[5]
 
 
 28
 Affirmed.
 
 
 
 Notes:
 
 
 *
 The Honorable Gerald S. Levin, United States District Judge for the Northern District of California, sitting by designation
 
 
 [1]
 In addition to counsel for the Board, the two unions and PMA, the district court permitted counsel for Brady, Jones, Willamette, General and the Commission of Public Docks to participate in the argument
 
 
 [2]
 In this court Warehousemen, designating itself "Respondent and Appellee," and PMA, designating itself "Charging Party — Appellee" have filed briefs in support of the Board order insofar as that order enjoins Engineers. The Board objects to Warehousemen and PMA designating themselves as appellees but states that it does not object to each such brief being considered as fromamicus curiae. PMA, on the other hand, asserts that, as a charging party, it is entitled to appear in this court as an appellee in support of portions of the Board order.
 The Board applied to the district court for this injunctive relief pursuant to section 10(l) of the Act. Under that section, any person involved in the charge is entitled to appear in the district court by counsel and to present relevant testimony. If the order entered by the district court aggrieves any such party, it undoubtedly has the right to appeal, as Engineers has done here.
 However, only the Board may seek injunctive relief under section 10(l), and, as to others, the Norris-LaGuardia Act, 29 U.S.C. §§ 107-115 specifically prohibits the issuance of injunctions in labor disputes except under circumstances not here present. PMA relies on International Union, United Automobile, etc., Workers v. Scofield, 382 U.S. 205, 86 S.Ct. 373, 15 L.Ed.2d 272 (1965), as authority for its right to appear here as appellee. But that was not a temporary injunction proceeding under section 10(l). The Supreme Court there dealt solely with the right of a party named as the respondent in an unfair labor practice charge, and of the party filing the charge, to intervene in a court of appeals review of an enforcement proceeding involving a final Board order.
 In Retail Clerks Union, etc. v. Food Employers Council, Inc., 351 F.2d 525 (9th Cir. 1965), the problem under discussion was broached but not decided. In San Francisco-Oakland Newspaper Guild v. Kennedy, this court entered an unreported order on May 20, 1969, rescinding an earlier order insofar as the earlier order permitted the intervention of the charging party in a section 10(l) proceeding. In Sears, Roebuck & Co. v. Carpet, Linoleum, Soft Tile and Resilient Floor Covering Layers, Local Union No. 419, AFL-CIO, 410 F.2d 1148 (10th Cir. 1969), the court employed a rationale which is adverse to the position of PMA here in holding that where the Board chose not to appeal from a district court order denying a petition for a section 10(l) injunction, the charging party had no standing to appeal.
 We conclude that neither PMA nor Longshoremen has standing as an appellee, but we authorize their appearance here as amicus curiae. The caption of this case has been recast to reflect this holding.
 
 
 [3]
 IBEW Local 292, AFL-CIO and Franklin Broadcasting Co., 126 NLRB 1212 (1960), and Siegel v. Local 399, Service Employees (C.D.Calif.1968) 70 LRRM 2421, cited by Engineers, did not involve jurisdictional disputes between two unions
 
 
 [4]
 Engineers states that Jones committed all the same "misconduct" as Brady except that Engineers does not know whether Jones accepted and adopted the contract between General and Engineers
 
 
 [5]
 Minnesota Mining and Mfg. Co. v. Meter, 385 F.2d 265 (8th Cir. 1967), relied upon by Engineers, involved a section 10(j) injunction. In that case it appeared that no injunction was needed to prevent irreparable harm to the union, or to protect the public interest, or to maintain thestatus quo. Moreover, the court cited with approval a case (Lebus for and on Behalf of NLRB v. Manning, Maxwell & Moore, Inc., 218 F.Supp. 702 [W.D.La. 1963]), in which a section 10(j) injunction altered, rather than preserved, the status quo.