NATIONAL LABOR RELATIONS
BOARD, Petitioner,

v.

The DENVER PHOTO–ENGRAVERS'
UNION NO. 18, INTERNATIONAL
PHOTO–ENGRAVERS UNION OF
NORTH AMERICA, AFL–CIO, Respondent.

No. 7957.

United States Court of Appeals
Tenth Circuit.

Aug. 26, 1965.

Solomon I. Hirsh, Washington, D. C.
(Arnold Ordman, Gen. Counsel, Dominick
L. Manoli, Associate Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel,
and Hans J. Lehmann, Atty., N. L. R. B.,
with him on the brief), for petitioner.

Samuel Edes, Chicago, Ill. (Claire I.
Rosen, Chicago, Ill., with him on the
brief), for respondent.

Gerhard Van Arkel, Washington, D. C.
(George Kaufmann, Washington, D. C.,
and Jack Henderson, Denver, Colo., with
him on the brief), for intervenor.

Before PHILLIPS, HILL and SETH,
Circuit Judges.

PHILLIPS, Circuit Judge.

This is a petition for enforcement of
an order of the National Labor Relations
Board, hereinafter referred to as the
Board, issued against the Denver Photo-Engravers' Union No. 18, International
Photo-Engravers' Union of North America, AFL–CIO, hereinafter referred to as
the Photo-Engravers' Union, ordering it
to cease and desist certain violations of
§ 8(b) (4) (ii) (D) of the National Labor Relations Act (29 U.S.C.A. § 158(b)
(4) (ii) (D)) and to post appropriate notices.

The Board proceedings arose from a
jurisdictional dispute between the Photo-Engravers' Union and the Denver Typographical Union No. 49, International
Typographical Union, AFL–CIO, hereinafter referred to as the Typographical
Union, with respect to the operation of a
Kenro camera installed in the composing
room of the Rocky Mountain News, a
daily newspaper published by the Denver
Publishing Company, hereinafter referred to as the Employer. Jurisdiction
of the Board is not in dispute.

Prior to November, 1962, the Employer
composed display advertisements for

publication by a hot type or hot metal composition process. In that process the ordinary letter print of an advertisement is cast in molten metal on a linotype machine. Lettering of an unusual size is cast in molten metal on a Ludlow machine. Linotype and Ludlow machines are operated by typographers. Other parts of an advertisement which cannot be produced on linotype or Ludlow machines, such as illustrations and half tones, are prepared by photo-engravers on zinc plates. When required for customer approval, velox or positive photographic prints of such parts are prepared by the photo-engravers. When the zinc plates are completed they are returned to the composing room, where a typographer assembles the complete advertisement in a chase. After the advertisement is so assembled, a proof is run by a typographer on a proof press located in the composing room and submitted to the customer for approval. If approved, the advertisement is set in page form and is then sent to the stereotypers, who cast a cylindrical plate for the printing press.

In 1959, the Board of Directors of the Employer undertook a study of the process of photocomposition with a view to installing equipment therefor in its composing room. During the next three years, considerable investigation was carried out by the Employer to determine the desirability of the process and the proper equipment needed. In July, 1962, the Board of Directors approved the purchase of photocomposition equipment and in the fall of that year delivery of the equipment began. In November, 1962, the first photocomposition advertisement was produced. At the time of the hearing both processes were being used, but the use of the cold process was being augmented.

In the photocomposition or cold type process, a machine known as a Fotosetter is substituted for the linotype. It produces a photographic positive of a line of type which is used in place of the metal type cast by a linotype in the hot metal process. The Fotosetter is operated by a typographer in the composing

room and that operation is not in dispute here. Unusual sizes of type, produced by the Ludlow machine in the hot metal process, and other components of an advertisement produced by photo-engravers on zinc plates in the hot metal process, are produced in the form of velox prints by the Kenro camera. These photographic components are then pasted on a large sheet of paper, which is then placed in the Kenro camera, which produces a paper offset plate. The offset plate is then placed in an Ectalith machine, which produces an offset master. From that master a proof is made on an offset press for submission to the customer for approval. If approved, the entire pasted-up copy is sent to the photo-engravers, who reproduce the advertisement on a flat metal plate. The flat metal plate is then sent to the stereotypers, who cast a cyclindrical plate for the printing press.

After the Employer had determined to purchase the photocomposition equipment, and in August, 1962, its editor met with representatives of the Typographical Union. He advised them that the operation of the new equipment would be assigned to the typographers in the composing room and asked the cooperation of the Typographical Union in training its members to operate it. Whereupon the Typographical Union provided on the job training for its members who were employed in the composing room of the Employer. Such training lasted four hours a day for approximately three weeks.

In August, 1962, the editor also met with representatives of the Photo-Engravers' Union and advised them of the determination to assign the photocomposition equipment to the typographers in the composing room. At that time, such representatives made no objection to the work assignment.

The reasons given by the Employer for assigning the photocomposition equipment to the typographers were: That such equipment was established in the composing room in other newspapers; that the work done by the photocomposition equipment was merely a new method

of doing that which had traditionally been done by typographers; that for reasons of efficiency all photocomposition should be done in one department under the supervision of one foreman before the final copy is sent to the photo-engravers; and that had the work been assigned to the photo-engravers it would have necessitated the purchase of additional equipment.

The composing department and the photo-engraving department are located in adjacent rooms approximately 100 to 150 feet apart in the plant of the Employer. There is a connecting door between the two departments and there is a free interchange of personnel between them.

The typographers in the composing room are sufficiently skilled to operate the Kenro camera and have operated it to the satisfaction of the Employer since it was installed. At least six other newspapers in the country use typographers to operate the Kenro camera.

The work assignment made by the Employer augmented rather than decreased the work load of the employee-members of the Photo-Engravers' Union.

The contract between the Employer and the Typographical Union in effect at all times here material provides in part as follows:

"Article XIII Jurisdiction of the Union

"2. Jurisdiction of the Union and appropriate unit for collective bargaining is defined as including all composing room work and includes classifications such as: Hand compositors, typesetting machine operators, makeup men, bank men, proof-press operators, proofreaders * * *, machinists for typesetting machines, operators and machinists on all mechanical devices which cast or compose type or slugs or film, operators of tape perforating machines (such as Teletypesetters) and recutter units for use in composing or producing type, operators of all phototypesetting machines (such as Fotosetter, Photon, Linofilm, Monophoto, Coxhead Liner, Filmotype, Typro and Hadego) and employees engaged in proofing, waxing and paste-makeup with reproduction proofs, processing the product of phototypesetting machines, including development and waxing; paste-makeup of all type, hand-lettered, illustrative border and decorative material constituting a part of the copy, ruling, photoproofing, correction, alteration, and imposition of the paste makeup serving as the completed copy for the camera used in the plate-making process."

On January 11, 1961, the Photo-Engraver's Union entered into a collective bargaining agreement, which by its terms expired October 1, 1962. On April 3, 1963, they entered into a collective bargaining agreement, which by its terms was made retroactive to October 2, 1962. Its termination date was October 1, 1964. Both contracts in the jurisdictional provision, which were substantially identical, included the terms "production of * * * offset plates * * * making of offset plates." For a substantial number of years before the installation of the Kenro camera, the photo-engravers had not made offset plates in the Employer's plant and the provision with respect to offset plates in the earlier contract was clearly superfluous. It would be unreasonable to conclude that the parties by the use of the same language in the later contract intended to settle the adverse contentions which continued to be asserted by the Photo-Engravers' Union and the Employer.

On October 25, 1962, the Employer received a letter from the attorney for the Photo-Engravers' Union, which stated the Photo-Engravers' Union contract and recognized jurisdiction covered the process of making all offset plates and the production of all negatives in connection therewith. The letter further stated that the Photo-Engravers' Union "is prepared to take all action necessary to protect said contract and jurisdiction."

On November 2, 1962, the Employer's personnel manager was notified that there was some trouble in the photo-engraving department. He and the editor went to that department and were advised that the photo-engravers would not handle a pasted-up photocomposition copy, which had come from the composing room. The employees agreed after a 10 or 15 minute work stoppage to proceed with their work under protest.

Thereafter, the Photo-Engravers' Union continued to threaten the Employer with strikes and picket lines.

On December 20, 1962, the Employer filed a charge with the Board, alleging the Photo-Engravers' Union had violated § 8(b) (4) (ii) (D) of the Act,[1] the "jurisdictional dispute" section, by threatening since on or about October 15, 1962, to picket or strike the Employer with the object of forcing or requiring the Employer to assign particular work "in connection with the operation of photocomposition (unrelated to photo-engraving process) machines and equipment, specifically camera work and offset plate making, to its member-employees rather than to member-employees of the * * * Typographical Union * * * to whom the Employer has assigned the work in dispute and who are now performing the disputed work." Upon finding reasonable cause to believe the Act had been violated, the Board held a hearing, pursuant to § 10(k) of the National Labor Relations Act (29 U.S.C.A. § 160(k)),[2] on February 26, 1963. At that hearing, the Photo-Engravers' Union took the position that its members were entitled by contract and historically recognized jurisdiction to perform all operations of the Kenro camera.

The Board found that although both unions relied upon their collective bargaining agreements to support their claims, neither contract expressly covered the disputed work; that with brief training, either typographers or photo-engravers could operate the Kenro camera satisfactorily; that the assignment by the Employer of the disputed work to the typographers was more efficient; that there was no relevant Company practice, but the Employer's assignment conformed to practice in the industry; and that the assignment of the disputed work to the typographers would not cause a loss of jobs for photo-engravers, but would increase their overall work load, while if the work was assigned to the photo-engravers, such assignment could conceivably eventually eliminate some typographers jobs.

The Board's decision and determination, made after the hearing, reads in part as follows:

" * * * Such factors as the Employer's award of the work to the typographers, the fact that these employees are sufficiently skilled to perform the work, and have performed it to the satisfaction of the Employer, who desires to retain them on the

---

1. Section 8(b) (4) (ii) (D) of the National Labor Relations Act, as amended, (29 U.S.C.A. § 158(b) (4) (ii) (D) provides as follows:

"(b) It shall be an unfair labor practice for a labor organization or its agents—

* * * * *

"(4) * * * (ii) to threaten, coerce, or restrain any person engaged in commerce or in an industry affecting commerce, where in either case an object thereof is—

* * * * *

"(D) forcing or requiring any employer to assign particular work to employees in a particular labor organization or in a particular trade, craft, or class rather than to employees in another labor organization or in another trade, craft, or class, unless such employer is failing to conform to an order or certification of the Board determining the bargaining representative for employees performing such work: * * *."

2. That part of Section 10(k) here pertinent provides as follows:

"(k) Whenever it is charged that any person has engaged in an unfair labor practice within the meaning of paragraph (4) (D) of section 158(b) of this title, the Board is empowered and directed to hear and determine the dispute out of which such unfair labor practice shall have arisen, * * *."

job, the consistency of the work assignment with custom and practice in the industry and with the terms of the Employer's contract with" the Typographical Union, "the comparative economy and efficiency of operations, and the fact that jobs available to photo-engravers will tend to increase under the prevailing assignment whereas jobs for typographers could contract under a contrary assignment, demonstrate the superior claim of the typographers to the disputed work. We conclude, therefore, on the basis of the record before us, that the assignment of the disputed work by the Employer to the typographers should not be disturbed. We shall, accordingly, determine the existing jurisdictional dispute by deciding that typographers rather than photo-engravers are entitled to the work in dispute."

The Board ordered that the Photo-Engravers' Union notify the Regional Director within 10 days whether it would refrain from forcing or requiring the Employer by means prohibited by § 8(b)(4)(ii)(D) of the Act to assign the work in dispute to photo-engravers rather than to typographers. Thereafter, the Photo-Engravers' Union notified the Regional Director that it did not deem the findings, conclusions and determination of the Board to be supported by the record or to have any reasonable warrant in law and that it would not act in accordance therewith. Thereupon, General Counsel for the Board issued a complaint alleging a violation of § 8(b)(4)(ii)(D) of the Act. A hearing was held on the complaint and by stipulation of the parties the only evidence adduced was the record in the § 10(k) hearing, the Union's letter refusing to comply with the Board's decision and determination and the contract of April 3, 1963 between the Employer and the Photo-Engravers' Union. The Trial Examiner found that the Photo-Engravers' Union had violated § 8(b)(4)(ii)(D) of the Act, and the

Board issued the order, enforcement of which is sought here.

In National Labor Relations Board v. Radio and Television Broadcast Engineers, 364 U.S. 573, 583, 81 S.Ct. 330, 336, 5 L.Ed.2d 302, the Supreme Court described the function of the Board in a § 10(k) proceeding as follows:

" * * * administrative agencies are frequently given rather loosely defined powers to cope with problems as difficult as those posed by jurisdictional disputes and strikes. It might have been better, as some persuasively argued in Congress, to intrust this matter to arbitrators. But Congress, after discussion and consideration, decided to intrust this decision to the Board. It has had long experience in hearing and disposing of similar labor problems. With this experience and a knowledge of the standards generally used by arbitrators, unions, employers, joint boards and others in wrestling with this problem, we are confident that the Board need not disclaim the power given it for lack of standards. Experience and common sense will supply the grounds for the performance of this job which Congress has assigned the Board."

Under the facts and circumstances of this case, we think it cannot be said that the Board erred in holding in effect that the parties to the contracts of January 11, 1961 and April 3, 1963 did not contemplate the term "offset plates" used therein would include offset plates made by the Kenro camera or concluding the work in question did not fall within an express provision of any of the employment contracts.

The Board considered the factors of the Employer's determination, employee skills and performance, custom and practice, consistency of the job assignment with the Typographical Union's contract, economy and efficiency, and the effect of the award on job opportunities and arrived at a reasonable and common sense conclusion, well within its discretion.

We are firmly of the opinion that the findings of the Board are supported by substantial evidence on the record considered as a whole [3] and that the decision of the Board was correct.

The order will be enforced.

3. 61 Stat. § 10(e), p. 148; 29 U.S.C.A. § 160(e).