**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**INTERNATIONAL DIE SINKERS' CONFERENCE, MILWAUKEE LODGE NO. 140, Respondent.**

**No. 16603.**

United States Court of Appeals
Seventh Circuit.

Oct. 18, 1968.

**408**

Marcel Mallet-Prevost, Asst. Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, Lawrence M. Joseph, Arnold Ordman, Mitchell L. Strickler, Attys., N.L.R.B., Washington, D. C., for petitioner.

Jerome F. Pogodzinski, Eisenberg, Kletzke & Eisenberg, Milwaukee, Wis., for respondent; Sydney M. Eisenberg, Milwaukee, Wis., of counsel.

Before KILEY, SWYGERT and CUMMINGS, Circuit Judges.

CUMMINGS, Circuit Judge.

Pursuant to Section 10(e) of the National Labor Relations Act (29 U.S.C. § 160(e)), the National Labor Relations Board has petitioned for enforcement of a cease and desist order entered against International Die Sinkers' Conference, Milwaukee Lodge No. 140 ("Die Sinkers") in an unfair labor practice proceeding (reported in 162 NLRB No. 52). The Die Sinkers have cross-petitioned, requesting this Court to review the Board's order and also its earlier resolution of the underlying jurisdictional dispute (reported in 157 NLRB 483).

In August 1965, the Ladish Co. of Cudahy, Wisconsin, charged that the Die Sinkers were engaging in an unfair labor practice in violation of Section 8(b) (4) (ii) (D) of the Act [1] by threatening economic action to force Ladish to as-

sign certain work to the Die Sinkers. Thereafter, acting under Section 10(k),[2] the Board resolved the jurisdictional dispute against the Die Sinkers and in favor of Technicians represented by the American Federation of Technical Engineers, Local 92, AFL–CIO.

In the Section 10(k) proceeding, the Technicians and the Die Sinkers claimed the work of programming and preparing tapes used to control tape-actuated machine tools in Ladish's die-sinking department. The Board found that programming was "a detailed prose description" of each step of the die-sinking process. These steps are then translated into coded numbers and mathematical symbols and typed on a flexowriter keyboard which reproduces them on a sheet of paper and also punches a tape with corresponding holes and spaces to actuate machinery to perform the program.

In May 1964, Ladish acquired tape-controlled die-sinking equipment. In January 1965, Ladish assigned the Technicians the work of programming and preparing tape for the new equipment. However, the work of operating the equipment was assigned to the Die Sinkers. In July 1965, a representative of the Die Sinkers informed Ladish that they would not operate any machine controlled by tapes unless the tapes were prepared by Die Sinkers.

---

1. Section 8(b) (4) (ii) (D) (29 U.S.C. § 158(b) (4) (ii) (D)) makes it an unfair labor practice for a labor organization:
 "(ii) to threaten, coerce, or restrain any person engaged in commerce or in an industry affecting commerce, where in either case an object thereof is—
 \* \* \* \* \*
 "(D) forcing or requiring any employer to assign particular work to employees in a particular labor organization or in a particular trade, craft, or class rather than to employees in another labor organization or in another trade, craft, or class, unless such employer is failing to conform to an order or certification of the Board determining the bargaining representative for employees performing such work
 \* \* \*."

2. Section 10(k) provides (29 U.S.C. § 160(k)):
 "Whenever it is charged that any person has engaged in an unfair labor practice within the meaning of paragraph (4) (D) of section 8(b), the Board is empowered and directed to hear and determine the dispute out of which such unfair labor practice shall have arisen, unless, within ten days after notice that such charge has been filed, the parties to such dispute submit to the Board satisfactory evidence that they have adjusted, or agreed upon methods for the voluntary adjustment of, the dispute. Upon compliance by the parties to the dispute with the decision of the Board or upon such voluntary adjustment of the dispute, such charge shall be dismissed."

In the jurisdictional dispute proceeding, the Die Sinkers contended that they alone were sufficiently skilled to receive training in tape programming for all die-sinking functions, and that Ladish's assignment of the work to the Technicians violated the recognition clause in the 1963 collective bargaining agreement between Ladish and the Die Sinkers.[3] Until the advent of the new equipment, the Die Sinkers received blueprints of dies from Technicians, decided on the layout for removing metal from the die blocks and then operated the machinery to manufacture the dies. The Die Sinkers served an eight-year apprenticeship in die sinking after a high school or vocational school education.

The Technicians contended that their members' technical knowledge and experience entitled them to do the work, pointing out that Die Sinkers were still required to operate the new equipment. Even before tape-controlled die-sinking machinery was purchased by Ladish, Technicians prepared programs and tapes for its tape-controlled machinery in other departments. They normally had technical school training and were subsequently specially trained in the language and systems of tape-controlled machines, so that they possessed the mathematical and other skills required for programming.

Ladish defended the assignment on the ground that the work was technical and being currently performed by Technicians elsewhere in its plant. As to its other production operations, Ladish stated that greater efficiency and economy of operation had resulted from the assignment of such work to the Technicians in view of their centralized programming for various departments of the company.

In determining the jurisdictional dispute in favor of the Technicians, the Board relied on Ladish's past practice of assigning them the work of programming for tape-controlled equipment in other production operations. The Board also found that the Technicians were trained to perform this type of work, whereas it felt that the Die Sinkers had not been so trained. The Board was also motivated by the fact that cost savings and efficiency of operations would be eliminated if programming were assigned to the Die Sinkers for Ladish's die sinking and to the Technicians for Ladish's other manufacturing.

In the jurisdictional dispute proceeding, the Board ordered the Die Sinkers to notify its appropriate Regional Director whether they would refrain from unfair labor practices as a means of forcing Ladish to assign this work to them. After the Board issued an order denying their motion to reconsider, the Die Sinkers advised the Regional Director that they did not intend to comply and were prepared to use economic means to prevent the continuing assignment of the work to the Technicians. Consequently, the General Counsel of the Board issued an unfair labor practice complaint against the Die Sinkers.

At the hearing on the unfair labor practice complaint, the Trial Examiner granted the Board's General Counsel's motion to strike certain portions of the Die Sinkers' answer, on the ground that they were an attempt to relitigate issues already determined in the jurisdictional dispute proceeding. For the same reason, he refused to receive certain evidence offered by the Die Sinkers.

In the unfair labor practice proceeding, the Examiner found that in July 1965, the Die Sinkers informed Ladish

3. This clause provided :
"The Company agrees to recognize the Union as the sole and exclusive bargaining agency for the purpose of collective bargaining in respect to rates of pay, wages, hours of employment, and other conditions of employment for all of its employees performing work directly involved in the manufacture and maintenance of all necessary models, dies or parts of dies used in and for the production and completion of forgings."
There was no collective bargaining agreement in effect with the Technicians' union until February 1965, but their union had been certified as their bargaining representative after a Board-conducted election in June 1964.

# 410

that they would not operate the tape-actuated machines in the die-sinking department if the machines were controlled by tapes prepared by Technicians. He found that the object of this threat was to force Ladish to assign the work to Die Sinkers rather than to Technicians, and that such conduct violated Section 8(b) (4) (ii) (D) of the Act. The Board subsequently affirmed the Examiner's rulings and adopted his recommended order that the Die Sinkers cease and desist from this conduct, post appropriate notices, and notify the Regional Director of their compliance steps.

Two questions are before us: (1) whether the Board's award of disputed work to the Technicians was proper, and (2) whether the Board acted within its discretion in affirming the unfair labor practice Examiner's refusal to receive new evidence supposedly bearing on the jurisdictional dispute.

 Since the Board has petitioned for enforcement of its unfair labor practice order, we have jurisdiction to review its prior resolution of the jurisdictional dispute determination. New Orleans Typographical Union No. 17 v. National Labor Relations Board, 368 F.2d 755, 762 (5th Cir. 1966).

In 1961, it was first authoritatively decided that Section 10(k) of the Act requires the Board to decide jurisdictional disputes on the merits, with the Board selecting which group of employees is entitled to the disputed work. National Labor Relations Board v. Radio and Television Broadcast Engineers, 364 U.S. 573, 81 S.Ct. 330, 5 L.Ed.2d 302. It was there recognized that the Board's powers under Section 10(k) "are broad and lacking in rigid standards to govern their application" (364 U.S. at p. 583, 81 S.Ct. at p. 336). However, the Court determined that the Board should draw upon its long experience in hearing and disposing of similar labor problems and upon its "knowledge of the standards

generally used by arbitrators, unions, employers, joint boards and others in wrestling with this problem." Idem. Congress intended the Board to use experience and common sense in settling these disputes.

After the promulgation of the *Radio Engineers* opinion, the Board enunciated its approach to this area in International Association of Machinists, Lodge 1743, AFL–CIO, (Jones Construction Co.), 135 NLRB 1402, 1410–1411:

"At this beginning stage in making jurisdictional awards as required by the Court, the Board cannot and will not formulate general rules for making them. Each case will have to be decided on its own facts. The Board will consider all relevant factors in determining who is entitled to the work in dispute, e.g., the skills and work involved, certifications by the Board, company and industry practice, agreements between unions and between employers and unions, awards of arbitrators, joint boards and the AFL–CIO in the same or related cases, the assignment made by the employer, and the efficient operation of the employer's business. This list of factors is not meant to be exclusive, but is by way of illustration." [4]

 In deciding that the disputed work at Ladish should go to the Technicians, the Board relied primarily on the following:

(1) The employer had assigned the work to the Technicians;

(2) The assignment was supported by the efficiency and economy of the employer's operations; and

(3) The Technicians alone possessed the necessary skills.

These points were considered to outweigh those advanced by the Die Sinkers. We conclude that the Board weighed appropriate elements in resolving this jurisdictional dispute. Even though some Die Sinkers may lose work

4. These considerations were quoted with approval in National Labor Relations Board v. Local 825, International Un-

ion of Operating Engineers, 326 F.2d 213, 217 (3d Cir. 1964).

by the substitution of the Technicians' tape-programming for some of the Die Sinkers' manual die sinking,[5] we agree with the Third and Fifth Circuits that where the Board has made its determination on the totality of factors involved, the award should not be disturbed. National Labor Relations Board v. Local 676, International Brotherhood of Teamsters, 376 F.2d 3, 5 (3d Cir. 1967); New Orleans Typographical Union No. 17 v. National Labor Relations Board, 368 F.2d 755, 762–763 (5th Cir. 1966).

■ The Die Sinkers also complain that the unfair labor practice dispute Examiner should have considered proffered testimony that the Technicians had not been able to produce usable dies on tape-controlled machines.[6] He refused to receive this evidence on the ground that it was an attempt to relitigate the jurisdictional dispute. According to the Die Sinkers' brief in this Court, the Technicians' only witness in the jurisdictional proceeding had testified that the Technicians "had never made a usable tape for a die sinking machine." The same point had also been made by the Die Sinkers in their memorandum supporting their motion to have the Board reconsider its jurisdictional dispute determination, but the Board concluded that this matter "affords no basis for a determination assigning the work to" the Die Sinkers. Since the Board itself had this factor under consideration before its final determination of the jurisdictional dispute, there was no need for the Examiner to receive cumulative evidence in the unfair labor practice case. See Harris v. White-

man, 243 F.2d 563, 565 (5th Cir. 1957), reversed on other grounds, 356 U.S. 271, 78 S.Ct. 734, 2 L.Ed.2d 754. Accordingly, the Board's affirmance of the Examiner's evidentiary ruling was not an abuse of discretion.

The Board's order should be enforced. It will be so decreed.

---

5. At the oral argument in this Court, counsel for the Die Sinkers admitted that none of them had lost his job.

6. Other testimony was proferred to show the incorrectness of matters in the jurisdictional dispute record, but the Die Sinkers had already had ample opportunity to present their case in that proceeding and were not entitled to retry the resolution of the jurisdictional dispute in the unfair labor practice proceeding. As stated by Justice Reed in another

connection in Stoll v. Gottlieb, 305 U.S. 165, 172, 59 S.Ct. 134, 137, 83 L.Ed. 104. "It is just as important that there should be a place to end as that there should be a place to begin litigation. After a party has his day in court, with opportunity to present his evidence and his view of the law, a collateral attack upon the decision as to jurisdiction there rendered merely retries the issue previously determined. There is no reason to expect that the second decision will be more satisfactory than the first."