**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**INTERNATIONAL LONGSHOREMEN'S AND WAREHOUSEMEN'S UNION, LOCAL NO. 50, Respondent, and International Union of Operating Engineers Local 701, Intervenor.**

**INTERNATIONAL LONGSHOREMEN'S AND WAREHOUSEMEN'S UNION, LOCAL NO. 50, Petitioner,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent, and Pacific Maritime Association, Intervenor. PACIFIC MARITIME ASSOCIATION et al., Petitioners,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent, and International Union of Operating Engineers Local 701, Intervenor.**

Nos. 72-1908, 72-2263 and 72-2315.

United States Court of Appeals, Ninth Circuit.

Aug. 29, 1974.

Julius Rosenbaum (argued), NLRB, Washington, D. C., for petitioner in 72–1908 and for respondent in 72–2315.

Norman Leonard (argued), of Gladstein, Leonard, Patsey & Andersen, San Francisco, Cal., for respondent in 72–1908, for petitioners in 72–2263 and for interested party ILWU in 72–2315.

Richard Ernst (argued), of Ernst & Daniels, San Francisco, Cal., for amicus Pacific Maritime etc. in 72–2263 and for petitioner in 72–2315.

Don S. Willner (argued), of Willner, Bennett, Meyers, Riggs & Skarstad, Portland, Or., for charging parties in 72–1908 and for interested parties in 72–2315.

Before MERRILL and DUNIWAY, Circuit Judges, and TAYLOR,* District Judge.

## OPINION

DUNIWAY, Circuit Judge:

The National Labor Relations Board petitions, in No. 72–1908, under 29 U.S.C. § 160(e), for enforcement of its cease and desist order against Local 50 of the International Longshoremen's and Warehousemen's Union. In Nos. 72–2263 and 72–2315, Local 50 and the Pacific Maritime Association (PMA), an association representing the employers, petition to set the Board's order aside. We deny enforcement in No. 72–1908 and grant the petitions in Nos. 72–2263 and 72–2315.

This is the fourth time that litigation stemming from this particular jurisdictional dispute between Local 50 (the Longshoremen) and Local 701 of the International Union of Operating Engineers (the Engineers) has reached this court. Two of our previous decisions have been published and in them we extensively reviewed both the underlying facts of the dispute and the administrative proceedings that led to judicial review. See Henderson v. International Longshoremen's and Warehousemen's Union, Local 50, 9 Cir., 1972, 457 F.2d 572; Henderson v. International Union of Operating Engineers, Local 701, 9 Cir., 1969, 420 F.2d 802. The Board's decisions in this case are reported at 193 N.L.R.B. 266 (1971) and 181 N.L.R.B. 315 (1970). Rather than once again burdening the books with a full recitation of the legal history of this dispute, we will state the facts only in the barest outline necessary for the present decision.

On April 3, 1969, in Astoria, Oregon, raftmen represented by the Longshoremen refused to hook up logs to barge-mounted floating whirly cranes which were loading logs onto ships and were operated by employees represented by

* The Honorable Fred M. Taylor, Senior United States District Judge for the District of Idaho, sitting by designation.

the Engineers. This work stoppage resulted in the firing of the Engineer crane operators by Brady-Hamilton Co. and W. J. Jones & Son, Inc., the stevedoring companies which had leased the barges and cranes, with their crews, from their owners. Longshoremen then began operating the cranes and they have done so ever since. In the work assignment dispute that has culminated in this litigation, both the Longshoremen and the Engineers claim the right to be assigned to operate the barge-mounted floating whirly cranes loading logs on ships in Astoria.

Shortly after the work stoppage, the Engineers filed unfair labor practice charges against the Longshoremen with the Board. The Engineers also began picketing the Brady-Hamilton and Jones jobsites. PMA, representing the employers, then filed unfair labor practice charges against the Engineers. The Board's Regional Director obtained an injunction under § 10(*l*), 29 U.S.C. § 160(*l*) of the National Labor Relations Act (NLRA). See Henderson v. International Union of Operating Engineers, Local 701, *supra*. After a short investigation, the Board concluded that there was reasonable cause to believe that both the Longshoremen and the Engineers had violated § 8(b)(4)(D) of the NLRA (29 U.S.C. § 158(b)(4)(D)), which forbids coercive union activity designed to force any employer to assign work to one union instead of another. As a result of this preliminary finding, the Board held hearings under § 10(k) (29 U.S.C. § 160(k)) to determine which set of employees was entitled to the work in dispute. At the conclusion of these hearings, the Board held that the employees represented by the Engineers were entitled to the work, 181 N. L.R.B. 315, 317.

The Longshoremen failed to notify the Board within the ten days fixed by the statute that it would comply with the Board's determination, and therefore the Board issued an unfair labor practice complaint against the Longshoremen. Hearings were held, and the Trial Examiner found that the Longshoremen had violated § 8(b)(4)(i)(ii)(D) of the NLRA and the Board adopted his findings, conclusions and recommendations and issued a cease and desist order against Local 50, 193 N.L.R.B. 266. This is the order that the Board now seeks to have enforced and that the Longshoremen and PMA seek to have set aside.

In an enforcement proceeding such as this, based upon the Board's determination that a union has violated § 8(b)(4)(D), there is usually no question that the union has committed unfair labor practices within the plain meaning of the statute, assuming that the Board's § 10(k) decision is valid. As the Supreme Court has noted, § 8(b)(4)(D) is inextricably tied to § 10(k). NLRB v. Plasterers' Union, 1971, 404 U.S. 116, 123, 92 S.Ct. 360, 30 L.Ed.2d 312; NLRB v. Radio and Television Engineers, Local 1212, 1961, 364 U.S. 573, 576, 81 S.Ct. 330, 5 L.Ed.2d 302 (hereinafter referred to as the *CBS* case). Because the Board's § 8(b)(4)(D) complaint is predicated upon its resolution of the work assignment dispute in the § 10(k) hearing the crucial question, in this case, is whether the Board's § 10(k) award is sustainable. NLRB v. International Longshoremen's and Warehousemen's Union, 9 Cir., 1967, 378 F.2d 33, 34. The only significant issues raised by the briefs submitted in this case concern the validity of the Board's § 10(k) award.[1] If we deter-

---

1. In its brief, PMA urges us to hold that § 10(k) decisions are directly reviewable. Twice before we have rejected this suggestion on the ground that no final order results from a § 10(k) hearing. Henderson v. International Longshoremen's and Warehousemen's Union, Local 50, *supra*, 457 F.2d at 577–578; NLRB v. International Long-

shoremen's and Warehousemen's Union, *supra*, 378 F.2d at 35–36. The decisions of this court in Waterway Terminals Co. v. NLRB, 9 Cir., 1972, 467 F.2d 1011, and of the Supreme Court in NLRB v. Plasterers' Union, *supra*, only serve to reinforce our holding that § 10(k) decisions are not directly reviewable.

mine that the Board's assignment of the disputed work to the Engineers is sustainable then the Board's cease and desist order must be enforced. Conversely, if we determine that the § 10(k) work award is not sustainable then enforcement should be denied.

## THE BOARD'S WORK AWARD

Since it has begun making affirmative work awards under § 10(k) in jurisdictional disputes, the Board has formulated its decisions in the same manner in the overwhelming majority of its cases. These decisions generally segregate the factors evaluated, discuss them in separate paragraphs, and make individual determinations about which union a particular factor favors. In its conclusions the Board usually cites the most influential of these factors. However, the Board almost always disclaims reliance upon any particular factor by asserting that the decision was made "[u]pon the entire record, and after full consideration of all relevant factors. . . ." Local 2, IUOE (PVO Int'l Inc.) 209 N. L.R.B. #109 at 10 (1974).

Unfortunately, the Board's decision-making process was, if anything, more obtuse than usual in the § 10(k) case under review. In its opinion the Board moved almost aimlessly from factor to factor without making explicit how much weight a particular factor was given or in some instances even which union the factor favored. Despite this unsatisfactory method of analysis, the Board did mention nine of the factors that it frequently evaluates in jurisdictional dispute decisions.

The Board noted that Engineers had operated the floating cranes loading logs on ships at Astoria from the time of their introduction there in 1964 until the work stoppage in 1969, and that the Longshoremen had "long acquiesced" in this assignment. Thus the factors of

past practice and acquiescence were presumably found to favor the Engineers.

The Board was more explicit in holding that the factors of skill, economy and safety favored the Engineers. The Board found that the work in question was very difficult and that the Longshoremen were, without exception, inexperienced at this work while the Engineers were highly skilled floating crane operators. The Board also found that after the Engineers were fired and replaced by Longshoremen, the safety record of the crane operation deteriorated while the expense of it increased. Outside repairmen had to be hired after the Engineers were fired because the Longshoremen, unlike the Engineers, were unable to service the cranes.

Additionally, the Board held that the Longshoremen's Board certification did not cover the disputed work because the certification was issued before the introduction of this type of crane. In considering the PMA-Longshoremen collective bargaining contract, to which the employers, Brady and Jones, were bound, the Board concluded that the agreement specifically excluded the disputed work from its provisions. The Board also distinguished prior Board § 10(k) decisions which had accorded this PMA-Longshoremen contract significant weight. Finally, while the Board failed to discuss employer preference, it did mention the fact that the employers' original work assignment was to the Engineers.

In sum, the Board's § 10(k) decision appears to rest upon the finding that the Engineers were more skilled, efficient, and safe employees whose work assignment the factors of past practice and acquiescence also favored. In finding in favor of the Engineers, the Board rejected the Longshoremen's claims that the factors of Board certifications, industry practice, collective bargaining

---

PMA and the Longshoremen also challenge the Board's order on the grounds that the Board failed to conform to the procedural requirements of the statute. These claims by their terms involve a challenge to the Board's procedures in all § 10(k) hearings. We need not entertain such a sweeping challenge to the Board's procedures because we grant the relief sought by the PMA and the Longshoremen on other grounds.

agreements, employer preference, and Board precedent favored them.

## JUDICIAL REVIEW OF § 10(k) WORK AWARDS

There are two components of judicial review of § 10(k) work assignments. First, in reviewing the Board's findings of fact, we are statutorily bound to apply the substantial evidence test. 29 U.S.C. § 160(e). Therefore, "findings of the Board with respect to questions of fact, shall be conclusive, if supported by substantial evidence on the record considered as a whole." NLRB v. International Longshoremen's and Warehousemen's Union, *supra*, 378 F.2d at 35; Waterway Terminals Co. v. NLRB, *supra*, 467 F.2d at 1018. Second, we examine the Board's legal conclusions in light of its fact findings. At this stage of judicial review, we apply the arbitrary and capricious standard: "[w]e must accept the Board's determination . . . unless such determination is arbitrary and capricious." NLRB v. International Longshoremen's and Warehousemen's Union, 9 Cir., 1969, 413 F.2d 30, 33. In turn we will apply these tests to the challenged work award.

### Substantial Evidence Test

There is an abundance of evidence in the record to support the Board's findings that at the time of the work stoppage the Engineers were more skilled, efficient and safe crane operators than were the Longshoremen. The findings as to past practice and acquiescence, which buttress these conclusions, are also supported by substantial evidence.

The Board's finding and conclusion that the Longshoremen's certification does not support a work award to them in this instance is also supported by the evidence. The 1938 Longshoremen certification, which is coastwide, covers only "longshore work." Shipowners Ass. of Pacific Coast, 7 N.L.R.B. 1002, 1041 (1938). Nothing in that certification specifically places the operation of barge-mounted floating whirly cranes loading ships within the Longshoremen's occupational jurisdiction. To assert that this work is by definition contained within the rubric "longshore work" would be to assume the answer to the central question at issue. The Board rejected such circular reasoning.

The main thrust of the PMA-Longshoremen argument for the denial of enforcement is that the Board misconstrued the PMA-Longshoremen collective bargaining contract. We agree.

In 1959, PMA and the Longshoremen entered into a coastwide mechanization agreement in an attempt to reconcile the need for the introduction of labor-saving machinery with the interests of the Longshoremen in job security. The PMA-Longshoremen briefs concede, as they must, that this agreement, as originally executed, explicitly excludes the operation of barge-mounted floating whirly cranes from the agreement's terms. The Board relied upon this clause to hold that the contract did not apply to the work in question.

PMA and the Longshoremen argue, however, that the agreement must be read in light of the interpretation given to it by the parties to it. They point out that shortly after the work stoppage, the parties entered into arbitration pursuant to a clause in the agreement to determine whether or not the agreement covered the disputed work. At the conclusion of the arbitration, on May 8, 1969, the Coast Arbitrator held that: "The position of the ILWU that the Agreement has assigned the work of operating floating cranes in Astoria to Longshoremen is sustained." This decision, we think, falls within the terms of the agreement, which contemplates the extension of the agreement to new types of equipment that may be introduced by the employers.

In its § 10(k) opinion, the Board completely ignored the results of this arbitration. This position was consistent with the Board's policy that it will not be bound by arbitration that does not include all of the parties to a jurisdiction-

al dispute. See, e.g., Lithographers & Photoengravers Int'l (Beacon Journal Publishing Co.) 185 N.L.R.B. 464 (1970). See also Johns, Jurisdictional Disputes Under the NLRA, Labor Law Developments 1967 at 46 (1967). This Board policy may be prudent in most instances. However, it was not appropriately applied to the arbitration in this case.

In many cases a jurisdictional dispute will arise between two unions, each of which has a contract with the same employer. This is the type of case that was before the Court in *CBS, supra*. In such a case the Board can hardly be bound to give effect to an award under one of the contracts which gives the disputed work to one of the unions when the other was not a party to the arbitration.

 This case is different. The employers, Brady and Jones, never were parties to a collective bargaining contract with the Engineers. For some years they had leased the barges and cranes from owners who did have a contract with the Engineers. The leased barge-cranes had previously been used for different work in the heavy construction industry, not for loading logs on ships. The lessors provided the operators, who became loaned employees of Brady and Jones. This, however, did not give rise to a collective bargaining agreement between the Engineers and Brady and Jones.

Moreover, immediately after the dispute arose, Brady and Jones found that the owners would lease the barges and cranes to them "bare-boat," i.e., without any crew. At that point the connection between Brady and Jones and the Engineers ceased. No one has claimed that there was any breach of contract between Brady and Jones and the Engineers when this was done. To hold that there was would be to lock the employers into a contract to which they were not parties merely because, when they first started to use the equipment, they leased it with crew. They would never be able to use the same equipment, whether leased or purchased, with their own employees as operators, unless they dealt with the same union as the one with which the former lessors had a contract. See I.L.W.U. (American Mail Line), 144 N.L.R.B. 1432, 1441 (1963).

Brady and Jones were parties to the coastwide PMA-Longshoremen agreement. The Longshoremen claimed that, under that agreement, they were entitled to the work. That is what the arbitration was about.

The fact that the Engineers were not a party to the arbitration does not undermine the validity of the award. The purpose of the arbitration was to decide upon the meaning of the agreement, and therefore the only logical or necessary parties to the arbitration were the parties bound by it, the Longshoremen and the PMA acting for Brady and Jones. The arbitration resulted in an interpretation of the contract that bound the parties to the contract. There was no legitimate ground for the Board's refusal to accept the parties' own interpretation of their contract.

 We are not bound to accept the Board's construction of a contract when it is not supported by substantial evidence or when it is not legally correct. NLRB v. Southern Calif. Dist. Council of Laborers, 9 Cir., 1971, 443 F. 2d 220. We conclude that the PMA-Longshoremen contract did assign the disputed work to the Longshoremen and that the Board's finding of fact to the contrary is incorrect.

This conclusion has a bearing upon the Board's other findings of fact. In its opinion the Board failed to give weight to the factor of employer preference, yet the employers' representative, PMA, has vigorously urged the vindication of the Longshoremen's claim. Furthermore, since the inception of the work stoppage, Brady-Hamilton and Jones have at all times assigned the crane operation to the Longshoremen,

which supports PMA's contention that the employers prefer that the Longshoremen be awarded the work.

In response to this contention the Engineers point out that before the work stoppage the employers had always assigned the work to the Engineers. However, as we have noted, this work assignment was made pursuant to the employers' lease agreement with the owners of the cranes. It was made by the then owners of the cranes, not by Brady and Jones, the employers here involved. Ever since the employers have had the contractual freedom to make their own crane operation work assignment, they have given this work to the Longeshoremen.

The foregoing discussion points out two significant facts. First this work dispute does not involve an employer caught in a cross fire between two unions with which the employer has contracts. Rather, only one union has a contractual claim to this work.[2] Second, the employers, once free from the lease agreement which permitted the barge owners to designate Engineers to do the work, have behaved continually in a manner consistent with the conclusion that they prefer the assignment of the work to the Longshoremen.

The Board's misconstruction of the contract may also have led to a misplaced emphasis on the factors of skill, efficiency and safety. The purpose of the PMA-Longshoremen mechanization agreement was to allow the employers to introduce new machinery while preserving the Longshoremen's right to fill all available jobs. Therefore, one of the employers' express obligations under the agreement was to train the Longshoremen to safely and efficiently perform all work covered by the contract. In its § 10(k) opinion the Board noted that such training commenced after the work stop-

page. If the Board had correctly determined that the contract covered the disputed work it might have given weight to the fact that the skill problem was anticipated by the agreement.

Perhaps more significantly, by determining that the PMA-Longshoremen contract did not bear upon the work dispute, the Board ignored the efforts of labor and management to provide for a peaceful and stable method of resolving labor crises caused by technological advancement. In its past decisions, the Board has been more responsive to these efforts. It has treated the very PMA-Longshoremen contract before us as persuasive evidence that the factor of industry practice favored a work assignment to the Longshoremen. In fact, the Board has praised this contract and has consistently shown deference to it. In United Industrial Workers of North America (Albin Stevedore Co.) 182 N. L.R.B. 633, 636 (1970), after determining that the collective bargaining contracts and Board certification were not controlling the Board stated:

"The trend in the maritime industry for the past decade has steadily been toward the replacement of manual labor by mechanized equipment. This reality was recognized early by parties concerned with shipping on the West Coast of the United States and it culminated in 1961 with the West Coast Longshore Agreement executed by the Pacific Maritime Association . . . and various craft unions. The primary aim of that agreement was to lighten the impact of unemployment upon longshoremen due to mechanization and thereby promote industrial peace in this area of American industry. The Board has recognized the soundness of this objective and indeed relied upon it as a factor favoring longshoremen in the ham-

2. In an ambiguous passage, the Board's decision quotes the barge crane owners' labor agreement with the Engineers without drawing any conclusion about its effect. To the extent that the Board relied upon this contract to hold that either the factors of collective bargaining contracts or employer preference favored the Engineers, the Board's reliance was misplaced. That agreement did not bind either Brady or Jones or the Longshoremen, and therefore has no bearing upon this jurisdictional dispute.

merhead crane case even though that dispute also involved the Seafarers, which is not a signatory to the agreement, and the Alaskan port, which is not covered by the agreement.

We see no reason to deviate from implementation of the above policy in this case, . . . we find that industry practice favors the longshoremen."

See also United Industrial Workers of North America (Sea Land Service Co.) 188 N.L.R.B. 241 (1971); United Industrial Workers (Albin Stevedore) 162 N.L.R.B. 1005 (1967); ILWU (Howard Terminal) 147 N.L.R.B. 359 (1964); ILWU (American Mail Line) 144 N.L. R.B. 1432 (1963); ILWU (PMA) 137 N.L.R.B. 119 (1962). But see ILWU (Matson Terminals) 140 N.L.R.B. 449 (1963); Atleson, The NLRB and Jurisdictional Disputes: The Aftermath of CBS, 53 Geo.L.J. 93, 133–34 (1964).

The Board did attempt to distinguish the above cited cases. However, the Board's misconstruction of the PMA-Longshoremen contract may have caused the Board to fail to find that industry practice favored the Longshoremen.

In sum, while many of the Board's findings of fact are supported by substantial evidence, the Board's erroneous finding or conclusion about the applicability of the PMA-Longshoremen contract casts doubt upon the validity of the Board § 10(k) decision. We must decide whether the Board's fact finding errors undermine its § 10(k) decision to the extent that the work assignment must be rejected as arbitrary and capricious.

### Arbitrary and Capricious Standard

The Board's authority to resolve jurisdictional disputes derives from the Taft-Hartley Act. However, from 1947 until 1961, the Board had a firm policy not to compel an employer to assign particular work to employees represented by one union, rather than another, unless the employer's assignment was in violation of a Board order, certification or collective bargaining contract. In CBS, supra, the Supreme Court put an end to this administrative policy by requiring that the Board make affirmative work awards in all genuine jurisdictional disputes.

One of the Board's reasons for its reluctance to intervene in jurisdictional disputes was that § 10(k) set forth no standards to guide it in resolving these disputes. The Court responded that it had faith in the Board's ability to overcome this handicap.

"It is true that this forces the Board to exercise under § 10(k) powers which are broad and lacking in rigid standards to govern their application. But administrative agencies are frequently given rather loosely defined powers to cope with problems as difficult as those posed by jurisdictional disputes and strikes. It might have been better, as some persuasively argued in Congress, to intrust this matter to arbitrators. But Congress, after discussion and consideration, decided to intrust this decision to the Board. It has had long experience in hearing and disposing of similar labor problems. With this experience and a knowledge of the standards generally used by arbitrators, unions, employers, joint boards and others in wrestling with this problem, we are confident that the Board need not disclaim the power given it for lack of standards. Experience and common sense will supply the grounds for the performance of this job which Congress has assigned to the Board." (CBS, supra, 364 U.S. at 583, 81 S.Ct. at 336.)

Almost fourteen months after CBS, the Board came down with its first § 10(k) decision under its new mandate. Int'l Ass. of Machinists, Lodge 1743 (J. A. Jones Construction Co.) 135 N.L.R.B. 1402 (1962). Once again the Board emphasized the difficulty of its task.

"Section 10(k) of the Act contains no standards to aid the Board in determining jurisdictional disputes. It says only that the Board is to 'hear and determine' the dispute. The leg-

islative history is equally lacking in indication of standards." (*Jones, supra,* 135 N.L.R.B. at 1410–11.)

The Board also stated that it was not going to establish any § 10(k) decisionmaking standards until it had gained a sufficient amount of the experience that the Supreme Court had referred to in *CBS.*

"At this beginning *stage in making* jurisdictional awards as required by the Court, the Board cannot and will not formulate general rules for making them. Each case will have to be decided on its own facts. The Board will consider all relevant factors in determining who is entitled to the work in dispute, e. g. the skills and work involved, certifications by the Board, company and industry practice, agreements between unions and between employers and unions, awards of arbitrators, joint boards, and the AFL–CIO in the same or related cases, the assignment made by the employer, and the efficient operation of the employer's business. This list of factors is not meant to be exclusive, but is by way of illustration. The Board cannot at this time establish the weight to be given the various factors. Every decision will have to be an act of judgment based on common sense and experience rather than on precedent. *It may be that later, with more experience in concrete cases, a measure of weight can be accorded the earlier decisions.*" (*Jones, supra,* 135 N.L.R.B. at 1410, emphasis added.)

Though the Board has subsequently resolved hundreds of § 10(k) disputes, it has never altered its position nor reevaluated its decisionmaking process. In fact, as we observed earlier, the form of these decisions as well as the decisions' reliance upon the "entire record and . . . all relevant factors" rarely deviate from a fixed pattern.

As might be expected, given the uncertainty surrounding the Board's basis for decisionmaking, the Courts of Appeals have been reluctant to deny enforcement to Board orders stemming from § 10(k) proceedings. We have been able to find only fourteen reported cases decided since *CBS* and *Jones* in which circuit courts have reviewed the merits of a § 10(k) decision.[3] In each of these cases, the Board's work award was sustained, as the Courts of Appeals have granted the Board broad leeway in carrying out its *CBS* mandate.

The arbitrary and capricious standard has been applied in a manner that has led us, along with our sister circuits, to defer to the Board's judgment both in the creation of and implementation of § 10(k) decisionmaking standards.

"The broad scope of the Board's functioning in section 10(k) proceedings is outlined in [*CBS*]. Under this section, Congress has committed to the Board a task which requires the exercise of a wide degree of discretion and its special expertise. Among other things, the Board considers the skills and work involved, certifications by the Board, company and industry practice,

---

3. Local 134, International Brotherhood of Electrical Workers v. NLRB, 7 Cir., 1973, 486 F.2d 863; NLRB v. International Longshoremen's and Warehousemen's Union, 9 Cir., 1969, 413 F.2d 30; NLRB v. Int'l Die Sinkers' Conference, Milwaukee Lodge, 7 Cir., 1968, 402 F.2d 407; NLRB v. Local 25, International Brotherhood of Electrical Workers, 2 Cir., 1968, 396 F.2d 591; NLRB v. St. Louis Printing Pressmen & Assistants Union No. 6, Inc., 8 Cir., 1967, 385 F.2d 956; NLRB v. International Longshoremen's and Warehousemen's Union, 9 Cir., 1967, 378 F.2d 33; NLRB v. Local 676, Int'l Bro. of Teamsters, etc., 3 Cir., 1967, 376 F.2d 3; New Orleans Typographical Union No. 17 v. NLRB, 5 Cir., 1966, 368 F.2d 755; NLRB v. Local 1291, International Longshoremen's Association, 3 Cir., 1966, 368 F.2d 107; NLRB v. Denver Photo-Engravers' Union No. 18, 10 Cir., 1965, 351 F.2d 67; NLRB v. Local 1291, International Longshoremen's Association, AFL–CIO, 3 Cir., 1965, 345 F.2d 4; NLRB v. International Brotherhood of Electrical Workers, 2 Cir., 1964, 339 F.2d 145; NLRB v. Local 991, International Longshoremen's Association, 5 Cir., 1964, 332 F.2d 66; NLRB v. Local 825, International Union of Operating Engineers, 3 Cir., 1964, 326 F.2d 218.

agreements between unions, and between employers and unions, the awards of arbitrators, the assignments made by the employer, and the efficient operation of the employer's business." (NLRB v. Teamsters, Chauffeurs, Warehousemen & H. Loc., U., 9 Cir., 1968, 403 F.2d 667, 673.)

The Third Circuit has stated that "it is the function of the Board and not this court to consider the relevant factors and to weigh and evaluate the evidence adduced with respect to each." NLRB v. Local 825, International Union of Operating Engineers, *supra,* 326 F.2d at 218. And the Eighth Circuit has agreed:

> "It is settled, however, that the Board's area of discretion in disposing of § 10(k) controversies is wide and, indeed, 'involves of necessity a large measure of informed discretion.'
>
> \* \* \* \* \* \*
>
> [T]he Board is thus free to resolve these matters on a case-by-case basis where experience and common sense are important factors." NLRB v. St. Louis Pressmen & Assistants Union No. 6, Inc., *supra,* 385 F.2d at 960 (per Blackmun).

The Fifth and Seventh Circuits have also agreed: "We agree with the Third and Fifth Circuits that where the Board has made its determination on the totality of factors involved, the award should not be disturbed." NLRB v. Int'l Die Sinkers' Conference Milwaukee Lodge, *supra,* 402 F.2d at 411.

In general terms, the Courts of Appeals have also approved the Board's reliance upon such varied criteria as skill, custom, efficiency, economy and past practice. See, e. g., NLRB v. Local 25,

International Brotherhood of Electrical Workers, *supra,* 396 F.2d at 594; NLRB v. Denver Photoengravers' Union No. 18, *supra,* 351 F.2d at 70–71. More significantly for the present controversy, the Third, Fifth and Eighth Circuits have all specifically approved the Board's position that collective bargaining contracts are only one factor among many to be considered in resolving jurisdictional disputes.[4] NLRB v. St. Louis Pressmen & Assistants Union, *supra,* 385 F.2d at 961; New Orleans Typographical Union #17 v. NLRB, *supra,* 368 F.2d at 763; NLRB v. AFL-CIO, *supra,* 345 F.2d at 10.

Our study of the Board's numerous § 10(k) awards persuades us that in some respects its decisions can be characterized as both arbitrary and capricious. Many commentators have examined the Board's 10(k) decisions and have been dismayed by the Board's failure to articulate any decisionmaking standards.[5] One observer complained that the "criteria have been shuffled and shifted to justify . . . a pre-ordained result."[6] The conclusions of the American Bar Association's special § 10(k) committee were even more critical:

> "Due to the lack of proper guideposts, the complexity of the problem, the multiple criteria employed and the variance in the weights accorded such criteria, the Board, since the *CBS* decision, has accomplished little other than to inject additional doubt and uncertainty into an already troublesome and difficult area of labor relations." (Supplementary Report of the Special 10(k) Committee 439 (1964).)

Since its *Jones* decision, the Board has consistently maintained that its poli-

---

4. See ILWU (Matson Terminals) 140 N.L.R.B. 449, 455 n. 6 (1963); ILA (Pa. Sugar Div.) 137 N.L.R.B. 1458, 1465 (1962).

5. See, e. g., Cohen, the NLRB and Section 10(k): A Study of the Reluctant Dragon, 14 Lab.L.J. 905, 918 (1963); Collister, Standards for Assignment of Work in Jurisdictional Work Disputes, 33 U.M.Kan. City L. Rev. 35, 58 (1965); O'Donoghue, Jurisdictional Disputes in the Construction Industry Since CBS, 52 Geo.L.J. 314, 358 (1963).

6. Atleson, The NLRB and Jurisdictional Disputes: The Aftermath of CBS, 53 Geo.L.J. 93, 150. One isolated though conspicuous example of this phenomenon was the Board's divergent treatment of the factor of wage scale differences among competing unions in United Bro'hood of Carpenters and Joiners of America, Local 171 (Knowlton Const. Co.) 207 N.L.R.B. No. 57 (1973) and in Sheet Metal Workers Int'l Ass., Local 553 (Ray Proof Corp.) 198 N.L.R.B. No. 36 (1972).

cy in making § 10(k) work awards is to decide each case on its own merits without announcing any standards or principles which govern the decisions that are made. Such a practice has relieved the Board of the burden of reconciling its decisions either with precedent or with any predetermined set of standards. Such a practice makes life easy for the Board's Trial Examiners or Administrative Law Judges, and for the Board itself. To call the practice a policy, however, is a misnomer. It is a little like making a bouillabaisse or pot au feu. Various ingredients go into the pot and are stirred and simmered, and no matter what they are, or what quantity or quality of each is used, the product is always the same—a bouillabaisse or a pot au feu. Nobody can dispute the conclusion; nobody can say, except as a matter of personal taste, whether the result is good or bad.

While the practice may be easy and comfortable for the Board, it makes judicial review virtually impossible, because the decision is totally unprincipled. There is no way for the reviewing court to determine what principles, if any, led to the decision. When the Board lays the stew before the court, its position is essentially this: "We have put in everything relevant, we have stirred the mixture, and this is the result. Whether you like it or not, you must accept it, because we, not you, are the experts. The Supreme Court told you that in CBS. Who are you to say that we are not?"

We do not think that the Congress or the Supreme Court intended that judicial review should be such a paper tiger. Since CBS the Supreme Court has not had occasion to review the Board's §

10(k) decisionmaking process, though it has reiterated that it is the Board's duty to make affirmative work awards. NLRB v. Plasterers' Union, supra, 404 U.S. at 131, 92 S.Ct. 360. Most of the circuit court decisions cited above involved the review of § 10(k) decisions that were made within a few years after CBS and Jones. The courts could be expected to give greater deference to Board decisions during the period in which the Board's decisionmaking process was developing. The time has come, however, for the Board to accord a measure of weight to its past decisions and to establish some rational principles governing the weight that it gives to the various factors it considers in § 10(k) hearings. In short, there is need for a good recipe for the stew.

We do not doubt the Board's ability to make principled decisions in this area. It has successfully done so in other areas in which the law also gives it wide discretion. It can do so here if it will. We think that it must. Its prior decisions in § 10(k) cases can give some guidelines.

Most observers who have systematically studied the Board's § 10(k) decisions agree that the Board's statement that no factor is necessarily more important than any other is simply false. Our own independent review of the Board's § 10(k) decisions reveals that the commentators are correct in concluding that the Board's work award coincides "in virtually every case" with the employer's preference.[7] Moreover, the Board's consistent reliance upon employer preference is not the only observable decisionmaking pattern. Whenever the Board determines that a collective bargaining contract clearly and unambiguously

7. C. Morris, The Developing Labor Law, 1972 Supplement at 136 (1972). This is a consistent occurrence despite the Board's protestations that employer preference is only one factor among the many to be considered. See Local 38, IBEW (Cleveland Illuminating Co.) 137 N.L.R.B. 1719, 1722 (1962). Every survey undertaken of Board § 10(k) decisions bears out this conclusion. See Atleson, supra, note 6 at 117, 151–52; Collister, supra, note 5 at 57–58; Gitlow, Technology and NLRB Decisions in Bargaining Unit and Jurisdictional Dispute Cases, 16 Lab.L.J. 731, 745 (1963); Johns, supra, at 52; O'Donoghue, supra, note 5 at 314; Note, Jurisdictional Disputes Since the CBS Decision, 39 N.Y.U.L.Rev. 657 (1964); ABA Section of Labor Relations Law: Report of the Committee on Development of Law under NLRA, 1964 at 124; 1965 at 445; 1967 at 99; 1968 at 110; 1970 at 97.

binds an employer to one (and only one) union, then that union is almost invariably awarded the work.[8]

We do not quarrel with the Board's consistent reliance upon employer preference, collective bargaining contracts and to a lesser degree other factors. More often than not, other factors deemed relevant by the Board, such as skill, efficiency, safety and employee integration, are factors that the employer himself has relied upon in making his work assignment.[9] Indeed, though the Board purports to rely upon its own evaluation of factors such as skill, efficiency and safety it is often apparent that the employer's evaluation of these factors influences the Board.[10] Furthermore, by giving significant weight to the employer's preference, the Board anticipated the Supreme Court's recognition of the critical stake that the employer has in the outcome of jurisdictional disputes. See NLRB v. Plasterers' Union, *supra,* 404 U.S. at 124–125, 130, 92 S.Ct. 360. In deferring to clearly and unambiguously applicable collective bargaining agreements, the Board also promotes the policies of the Taft-Hartley Act. By recognizing the importance of collective bargaining agreements, the Board enables union and management to provide for the stable and predictable settlement of labor disputes, through arbitration and otherwise. See *Id.* at 133, 136–137, 92 S.Ct. 360; Carey v. Westinghouse, 1964, 375 U.S. 261, 266, 84 S.Ct. 401, 11 L.Ed.2d 320.

What we do object to is the Board's refusal to acknowledge the extraordinary importance of these two factors in its § 10(k) decisionmaking process. As we have said, the failure of the Board to establish any standards precludes viable judicial review. The case before us is a good example of the problems created by standardless decisionmaking.

█ The Board's work award to the Engineers conflicts with two of the factors that the Board often relies upon. It is possible, of course, that the Board may think that the Engineers should get the work despite the PMA-Longshoremen contract and the employers' preference. On the other hand, the Board may determine that in light of the correct interpretation of the contract, the factors of skill, efficiency, safety, acquiescence and past practice are not controlling. Our reversal of the Board's conclusion as to the applicability of the contract precludes us from sustaining the Board's work assignment in this case. The Board must be given the first opportunity to use its accumulated expertise and make a principled rather than an arbitrary award of the work in light of the correct construction of the contract.

█ In exercising this discretion, it will not suffice for the Board again to merely list the relevant factors and then come to a conclusion without explaining why it comes to that conclusion. The Board must explicitly recognize that it has traditionally given importance to such factors as employer preference and collective bargaining contracts, absent countervailing circumstances, in its past decisions. In doing so, a body of precedent will be (and in reality has been) developed from which intelligible decision-making standards will emerge. The Board may still evaluate each jurisdictional dispute on its own merits and it need not be limited by a rigid set of standards or principles. But when the Board decides that certain factors take precedence over others, it must explain why and reconcile its decisions with its past judgments. Otherwise, § 10(k) will not bring the desired stability to the

---

8. See generally surveys *supra* note 7 and cases cited therein. The Board has a firm policy that collective bargaining contracts will be deemed persuasive in § 10(k) hearings only if they clearly and unambiguously assign the work. See 37th Annual Report of the NLRB for the Year Ending June 30, 1972 at 124.

9. See Johns, *supra,* at 52–53.

10. See, e. g., Local 10, Bricklayers, Masons, Plasterers, Marble, Tile and Terrazo Workers (Unistress Corp.) 198 N.L.R.B. No. 67 (1972).

**1222**

process by which jurisdictional disputes are resolved, and the courts will be unable to determine whether or not the Board's decisions are arbitrary and capricious.

 In this case the only applicable collective bargaining agreement assigns the disputed work to the Longshoremen. The employers also appear to prefer that the work assignment go to the Longshoremen. In light of the Board's policy of giving controlling weight to these factors under similar circumstances, we are unable to conclude, absent convincing reasoning from the Board to the contrary, that the Board's work assignment to the Engineers is not arbitrary and capricious.

In No. 72–1908, the Board's petition for enforcement is denied. In Nos. 72–2263 and 72–2315, the petitions for review are granted, the Board's order is set aside, and the case is remanded to the Board for further proceedings consistent with this opinion.